(No. 6430.   April 2, 1938.)

JENNIE B. MORGAN, WILLARD WICKEL, REUBEN A. WARD and ART M. WARD, ELIHU BEECHER, GEORGE HEPWORTH, JOSEPH R. HURD, ASEL PARISH and EDWARD RASMUSSEN, Appellants, v. LOT UDY, Respondent.

[79 Pac. (2d) 295.]

S. T. Lowe, for Appellants.

H. A. Baker, for Respondent.

GIVENS, J.—Respondent owns the E½NW¼; W½NE¼ and the NE¼SW¼ in section 28, tp. 13 S. R. 25 E. B. M. on both sides of Cassia Creek which flows generally northeast.

The land lying north of and adjacent to Cassia Creek slopes south and east, the land lying south slopes to the north. Appellants own land to the west and south of respondent on both sides of Cassia Creek. Respondents' predecessors in interest, in the District Court of the Fourth Judicial District in and for Cassia County, in the case of *Darby v. Jones*, in 1893, wherein appeared the predecessors in interest of all the parties herein, were decreed 110 inches of water for use on the above land, with priority of May 15, 1873, and 12 inches of April 30, 1887. The other parties were therein decreed later priorities. All these priorities were later reaffirmed in the case of *Albion-Idaho Land Co. v. Adams* in the federal district court in 1928. Nothing was stated in either decree as to the points of diversion, means or methods of conveyance, or rights therein or thereto.

In 1875 appellants' predecessors constructed a ditch called the Rice-Lessey Ditch on the south side of Cassia Creek with point of diversion some five miles southeast and up the creek from respondent's and appellants' lands, through which most of the waters now owned by appellants have since been conveyed.

Appellants contend that until a short time prior to the institution of this action, the respondent's 1873 water had been diverted from Cassia Creek at a point approximately 100 yards west of the east boundary line of the Morgan-Wickel land, being respondent's west line, and that respondent has no right to divert the 1873 water through the Rice-Lessey Ditch, and the present action, so far as it affects the parties now remaining in the litigation was brought to restrain respondent from conveying any of his water through the Rice-Lessey Ditch, and from changing his point of diversion up Cassia Creek from the two points of diversion where he diverts water on the north side of Cassia Creek. Respondent, in his original answer and by amendment, claims

the 1893 and the 1928 decrees, though silent thereto, are necessarily, because of the issues directly, and which could and should have been litigated therein, *res judicata* of his right to convey his water in the Rice-Lessey Ditch, and if not *res judicata,* he or his predecessors in interest have acquired a prescriptive right of conveyance through the ditch.

The underlying reason for the litigation is this: There is increment into Cassia Creek by springs and creeks between the point of diversion of the Rice-Lessey Ditch and respondent's land of more than enough water to supply his rights, at such a low elevation, however, that such increment cannot be taken out to irrigate either his NE¼ of SW¼ or any of appellants' lands, and if respondent takes enough water through the Rice-Lessey Ditch to irrigate this NE¼ of SW¼ having a superior water right in point of time to appellants, they are deprived by that much at the point of diversion of the Rice-Lessey Ditch.

The court found in favor of respondent on both *res judicata* and prescription and decreed a prescriptive right as follows:

## "XXI

"That the said defendant, Lot Udy, and his predecessors in interest have for a long time, and for more than five years prior to the commencement of this action, contributed to the payment of the cost of the diversion works and measuring devices at the head of said Rice Lessey Ditch, have performed work and labor on the same in cleaning it and in removing obstructions to the flow of water therein, and he and they, for many, and more than five years prior to the commencement of this action have actually used said Rice Lessey Ditch as a means for the diversion from Cassia Creek and the transportation to and upon the land of said defendant of such portion of said water right with date of priority of May 15, 1873, so decreed to the predecessors in interest of said defendant, as he and they desired to use for the irrigation of said land so incapable of irrigation through any other ditch and, for a longer period than five years immediately preceding the commencement of this action, the defendant, Lot Udy, and his predecessors in in-

terest have continuously, uninterruptedly, notoriously, adversely and under claim of right used said Rice Lessey Ditch for that purpose; that the said defendant, Lot Udy, did not at any time have any notice or knowledge, either actual or constructive, of any claim of limitation on the right of the occupant of his land to divert at the head of or to convey through said Rice Lessey Ditch water of any date of priority for the irrigation of his land.

"XXII

"That by reason of the diversion at the head of said Rice Lessey Ditch and the conveyance through the same by said Merritt Beecher and his successors, including the defendant, Lot Udy, of sufficient of said water with date of priority of May 15, 1873, to irrigate said land so incapable of irrigation through any other ditch, said land has reached, for many years has been, and now is in a high state of cultivation and profitable agricultural crops have been and now are being produced upon the same; that upon said portion of said land are located, in addition to agricultural crops, the brick dwelling house, garden, lawn, shade and other trees, barns, corrals and other improvements of the defendant, Udy; that if the said Udy were enjoined and restrained from diverting at the head of and conveying through said Rice Lessey Ditch sufficient of said water right with priority dating from May 15, 1873, to irrigate said land, the said land would be unproductive and of no substantial value.

"XXIII

"That the evidence offered on the part of the plaintiffs in this action wholly fails to show that any injury has been sustained by any of said plaintiffs in consequence of or by or through the diversion at the head of and the transportation through said Rice Lessey Ditch of sufficient of said water with date of priority of May 15, 1873, to irrigate that portion of the land of the defendant, Lot Udy, so incapable of irrigation through any other ditch and the evidence on the part of the plaintiffs wholly fails to show that any injury will be sustained by any of them by reason of the continued use of said ditch for such purpose.

## "XXIV

"The Court finds it is not true that the defendant, Lot Udy, is seeking to procure an additional point of diversion of said water with date of priority of May 15, 1873, and that he is not wrongfully, or illegally, or unlawfully claiming the right to divert and transport or convey or is wrongfully, illegally, or unlawfully diverting, transporting, and conveying through said Rice Lessey Ditch sufficient of said water with date of priority of May 15, 1873, to irrigate said land so incapable of irrigation through any other ditch. The Court further finds that the said defendant, Lot Udy, has the right to divert at the head of and to convey through said Rice Lessey Ditch to and upon said land sufficient of said water right with date of priority of May 15, 1873, to irrigate the portion of his said land incapable of irrigation by water diverted and conveyed through any other ditch as hereinbefore found and at one of the points of diversion of said water right of May 15, 1873, is at the head of said Rice Lessey Ditch.''

## "CONCLUSIONS OF LAW

### "II

"That each of said Courts must have found and determined that each of said water rights was diverted from Cassia Creek at a sufficient elevation to permit its application to and use upon each legal subdivision of the land to which it was decreed and made appurtenant.

### "III

"The Court concludes that each of said courts must have found and determined that sufficient of water decreed to and made appurtenant to the land of the defendant, Lot Udy, including the water right with date of priority of May 15, 1873, to irrigate said land incapable of irrigation through any ditch other than said Rice Lessey Ditch was actually diverted at the head of said Rice Lessey Ditch and conveyed through it to the land now owned by the defendant, Lot Udy, and also found and determined that one of the points of diversion of said water, including said water with date of priority of May 15, 1873, was at the head of the said Rice Lessey Ditch.

## "IX

"That the said defendant, Lot Udy, is entitled to divert at the head of said Rice Lessey Ditch and to convey through the same sufficient of the water decreed to and made appurtenant to the land owned by him to irrigate that portion thereof incapable of irrigation through any other ditch.

## "X

"That the plaintiffs are not entitled to decree granting them the relief prayed for or any other relief; that decree should be entered that the plaintiffs take nothing by their complaint on file herein, that the same be dismissed and that the defendant, Lot Udy, have and recover of and from the plaintiff his costs and disbursements herein expended."

The first question is what did the '93 decree adjudicate directly or as issues which *could and should* have been presented as necessarily, though hidden, concomitant essential foundations supporting the priorities declared? (*Joyce v. Murphy Land etc. Co.*, 35 Ida. 549, 208 Pac. 241.) The decree definitely fixes the date of priorities, the amount of priorities, and the land for which the water was appropriated. Though not mentioned, these issues must have been likewise decided, that is, *might and should* have been determined: First, that respondent's 110 inches had been applied to a beneficial use at least generally on the lands described in, and prior to, the 1893 decree; second, that there was a diversion from the stream. (*Van Camp v. Emery*, 13 Ida. 202, 89 Pac. 752; *Hutchinson v. Watson Slough Ditch Co.*, 16 Ida. 484, 490, 101 Pac. 1059, 133 Am. St. 125; *Nielson v. Parker*, 19 Ida. 727, 115 Pac. 488.) Diversion from the stream necessarily carries with it the determination that the water user has a point of diversion, because it is at the point of diversion where the water is measured. Where the method of conveyance is by gravity, as it unquestionably is and has been in this case, such point of diversion must have been high enough up the stream to permit the water to be diverted out of the stream and carried by gravity to the place of use. (*Reno v. Richards*, 32 Ida. 1, 13, 178 Pac. 81.)

It is conceded that the only way respondent's water could have been, and up to the present has been con-

veyed to the NE¼ of the SW¼ was through the Rice-Lessey Ditch; therefore, the court in awarding the part of the 1873 water right adjudicated to this portion of respondent's land must have considered he had a point of diversion at the head of the Rice-Lessey Ditch. (*Moe v. Harger*, 10 Ida. 302, 77 Pac. 645; *Sarret v. Hunter*, 32 Ida. 536, 185 Pac. 1072.) In this state a ditch right and water right may be independent, separate and apart. (*Ada County etc. Co. v. Farmers' etc. Co.*, 5 Ida. 793, 51 Pac. 990, 40 L. R. A. 485; *Stocker v. Kirtley*, 6 Ida. 795, 59 Pac. 891; *Park v. Boulware*, 7 Ida. 490, 63 Pac. 1045; *In re Department of Reclamation*, 50 Ida. 573, 300 Pac. 492.) Therefore, while respondent's legal right of conveyance and means of conveyance could have been litigated, it was not so necessary to the determination of the priorities that in the legal sense it *should* have been litigated. (*Utt v. Frey*, 106 Cal. 392, 39 Pac. 807, 809; *Crooker v. Benton*, 93 Cal. 365, 28 Pac. 953; *Lower Tule River Ditch Co. v. Angiola Water Co.*, 149 Cal. 496, 86 Pac. 1081.) Otherwise one with only a permissive or rented use to a right of way for the conveyance of his water could never acquire a priority, which would be contrary to his constitutional rights if he actually diverted and applied it to a beneficial use with intent to appropriate as against other concededly subsequent appropriators, though we are not unmindful of *McPhail v. Forney*, 4 Wyo. 556, 35 Pac. 773, *Farm Inv. Co. v. Gallup*, 13 Wyo. 20, 76 Pac. 917, and *McRae v. Small*, 48 Or. 139, 85 Pac. 403. The citation of *McPhail v. Forney, supra*, in *Rabido v. Furey*, 33 Ida. 56, 62, 190 Pac. 73, does not involve the precise point involved herein. In other words, in this state one may have a valid appropriation though only a temporary and revocable way of conveyance for his water; diversion and application to a beneficial use being the two essentials.

Appellants urge that because the predecessors of the parties involved herein were not in either the case of *Darby v. Jones* or *Albion-Idaho Land Co. v. Adams* adversaries the determination therein of the points of diversion cannot be considered as *res judicata* and cite numerous authorities, none of which involved the adjudication of water

rights, in which kind of suits (i. e., water) the law has been laid down by this court contrary to appellants' contention:

" . . . . Yet we do not overlook the fact that in the settlement of cases of this character every user of water on the stream and all of its tributaries in litigation are interested in the final award to <u>each claimant . . . . every claimant of the water of either stream, it matters not whether it be at the upper or lower end of either or after the junction of the two, is interested in a final adjudication of all the</u> claimants of all the waters that flow to the claimants at the lower end of the stream after its junction. In other words, in my view of the question presented by the demurrer, it matters but little who are plaintiffs and who are defendants in the settlement of cases of this character, the real issue being who is first in right to the use of the waters in dispute." (Underscoring ours.) *Frost v. Alturas Water Co.,* 11 Ida. 294, 301, 81 Pac. 996.

It is appellants' contention that respondent's or his predecessors' use of the Rice-Lessey Ditch for his 1873 water was merely permissive so far as his own water was concerned, or by rotation or exchange of water with appellants or their predecessors and others concededly joint or co-owners in the ditch. Respondent, on the other hand, contends his use of the Rice-Lessey Ditch for his 1873 water was always under claim of right and so open, notorious and adverse as to have ripened into a prescriptive right.

The latest expression by this court of the law and an analysis of the essential evidence in a situation of this kind, i. e., a permissive use changing and a prescriptive right being acquired is found in *Bachman v. Reynolds Irr. Dist.,* 56 Ida. 507, 518, 519, 55 Pac. (2d) 1314 as follows:

" 'As we have seen in previous sections, right of way for ditches, canals, or other works may be acquired over private lands by grant from the owner thereof. So, also, such right of way may be acquired over the private lands of another by adverse possession, from which a grant, of course, is presumed. Also ditches and canals after their construction together with their rights of way, may be acquired by prescription. . . . . The right may have its inception by permis-

sion or license, but in order to constitute adverse possession of a right to use a ditch or canal across the land of another, originally given by permission or license, the licensee must have repudiated the license and have brought the knowledge of the repudiation home to the owner of the land, and thereafter must have held adversely for the statutory period. . . . . '' (2 Kinney on Irrigation and Water Rights, 2d ed., p. 1870, sec. 1045.)

'' 'Under this state of circumstances (use under revocable license or permission) before there can be any adverse holding, it is necessary for the party claiming the easement for a right of way to have repudiated the license or permission, and to have brought the knowledge of such repudiation home to the owner of the land giving such permission; and thereafter he must have continued to have held the right adversely for a time sufficient under the statute for the acquisition to an interest in the land by prescription. The right cannot be regarded as adverse, while the licensee acknowledges the right of the land owner and pays compensation for the use of the land.' (2 Kinney on Irrigation and Water Rights, 2d ed., p. 1744, sec. 985.)

'' 'The evidence is without conflict that the ditch was used by appellant (respondents here) uninterruptedly and continuously for more than the prescriptive period, which raised a presumption that such use was adverse and under a claim of right (19 C. J. 959); and there is not sufficient evidence (no evidence after October 1928, herein) of parol license to overcome this presumption or justify the above finding of the court. (1 Jones' Commentaries on Evidence, 2d ed., sec. 41, note 11.)' ''

Keeping in mind the above as a guide, the following *résumé* and synopsis of the testimony is sufficient to enable us to arrive at a correct solution of the matter, as stated in *Call v. Coiner*, 43 Ida. 320, 251 Pac. 617, "scrambling in the ditch":

MERRITT BEECHER, prior owner of respondent's land:

"A. Until 1911 I never used any '73 water through the Rice Lessey Ditch.

"Q. Did you ever divert through the Rice Lessey Ditch more than that 14 inches of '87 water?

"A. I don't think the ditch would carry it any time I had it.

"Q. What is your answer Mr. Beecher to my question?

"A. No.

"Q. And that twelve inches of water (1887 water) was all the water that was used by you on the land south of the old ditch, isn't that right?

"A. Estimated to be about that, yes."

S. H. BARKER, co-owner of the Rice-Lessey Ditch:

"A. To my knowledge 1873 water has never been diverted at the head of the Rice Lessey Ditch for the irrigation of the land owned by the defendant Mr. Udy.

"A. Of course his land didn't grow crops before it was taken up, I think he has growed crops there every year, I couldn't say positively every year, but I think so."

MR. HURD, co-owner of the Rice-Lessey Ditch:

"A. Since I have been living on that place in 1919—when I bought the place on the Rice Lessey Ditch, he (Udy) hasn't been using any '73 water through the Rice Lessey Ditch.

"A. I am satisfied he has raised a crop on it, I couldn't say for sure."

MR. BRAYDEN, former employee on Wickel land:

"A. During the years 1914, '15 and '16 some kind of crops were grown on the Udy land under the Rice Lessey Ditch."

MR. DE ATTLEY, watermaster 1920–21, supervisor of Rice-Lessey Ditch 1933:

"A. During that year (1933) I did not turn the defendant Udy any water out of the Rice Lessey Ditch.

"A. No water at all was delivered by me to the Udy land through the Rice Lessey Ditch in either of the years 1920 or '21.

"A. I recollect having the demand served upon me that I deliver through the Rice Lessey Ditch water for the irrigation of the Taylor land (now Udy's) signed by Mr. Lowe as the attorney for Taylor brothers.

"A. Pursuant to that demand I turned it but I turned it off right away.

"A. It was turned on about twelve hours I think, twenty-four.

"A. I turned the full decree of 1873 water down, 110 inches.

"Q. But you did permit Udy to take 1873 water out of the Rice Lessey Ditch in 1933, didn't you?

"A. It was charged to Mr. Wickel.

"Q. Answer the question Mr. Cursey or Mr. De Attley—didn't you?

"A. No, sir, I didn't.

"Q. You permitted him to take it out of the ditch in 1933?

"A. No, sir.

"Q. He took it didn't he?

"A. Mr. Wickel took it and let him have it after he took it.

"Q. He got water out of the Rice Lessey Ditch in 1933?

"A. Yes, sir.

"Q. You charged him for it?

"A. Yes, sir."

MR. SEARS, watermaster 1923–24:

"A. I did not deliver any water to the Udy land other than that one point of diversion. (i. e., through the Middle ditch.)

"Q. Notwithstanding the fact 1923 and '24 or 1924 or '25 were high water years you delivered no water to the Udy land through the Rice Lessey Ditch, is that right?

"A. I never put any through there.

"A. I think they produced crops on that land that year.

"Q. That land is dry and requires water?

"A. Yes, requires water.

"Q. It wouldn't produce crops without it?

"A. I don't imagine so."

MR. PIERCE, watermaster 1925:

"A. I delivered no water to the old Merritt Beecher place (Udy land) through the Rice Lessey Ditch in 1925."

MR. WILLIAMS, watermaster 1931:

"A. I delivered water through that (Rice Lessey Ditch) to the Udy land.

"A. I couldn't say how long a time.

"Q. Can you tell approximately?

"A. No I wouldn't be able to say at all as to how many days; Mr. Wickel and Mr. Udy had made a trade of water there and I don't know just how many days that amounted to.

"Q. They had made a trade of water you say?

"A. That is what they termed it, yes.

"Q. Can you explain the exchange that was made?

"A. Well, as I understand it and remember it we left Mr. Wickel's water in the Rice Lessey Ditch and that is the way Mr. Wickel as I remember it agreed to it—left his water in the ditch and turned it to Mr. Udy and turned Mr. Udy's water to Mr. Wickel on the north side.

"Q. To whom was the water that was left in the Rice Lessey Ditch charged?

"A. Charged to Mr. Wickel; he had a 100 inches, as I recall it his 1873 right was a 100 inches and Mr. Udy's 110; I believe Mr. Wickel got the benefit of the 10 inches in the trade, although the water was charged to the men it was decreed to."

MR. GAMBLE, watermaster 1932 to '34:

"A. He and Mr. Wickel had some kind of exchange in their water and I would put Wickel's water in the Rice Lessey Ditch and give Mr. Udy water through the North Ditch and when they would get through that way they would change; Mr. Wickel would take his water on the north side.

"Q. In other words they would handle it this way—Wickel would use the north ditch and Udy use the south ditch?

"A. Yes sir.

"Q. Mr. Udy I take it got sufficient water through the Rice Lessey Ditch to produce a crop in 1934 on the land lying under that ditch, is that right?

"A. He had a crop, yes."

MR. WARD, plaintiff herein:

"A. To my knowledge Mr. Udy's water has never been diverted through the Rice Lessey Ditch, his '73 water."

MR. PARISH, plaintiff herein:

"Q. Do you know whether or not the defendant Lot Udy has used the Rice Lessey Ditch for the irrigation of his land?

"A. Well there is water run down through that ditch, yes, sir.

"Q. Yes, but do you know how it ran there, under what arrangement, if any, it ran down there?

"A. No, sir.

"Q. Did you ever know of him using the Rice Lessey Ditch?

"A. No, sir.

"Q. Did you ever know of Mr. Udy claiming any right to the use of the Rice Lessey Ditch for the transportation of 1873 water?

"A. No, sir."

MR. FEWKES, owner of Udy land 1923–25:

"A. I used water through the Rice Lessey Ditch.

"Q. Under what arrangements did you use it?

"A. That I used the water whenever Mr. Wickel was using it we rotated it; when he got through using the water he turned it down to me and I would use it.

"Q. He turned it down to you which way?

"A. He turned it right down the Rice Lessey Ditch into my place.

"Q. Did you while you were there claim any right to transport your 1873 water through the Rice Lessey Ditch?

"A. No, sir.

"Q. And whatever water you used there was just through the acts of Mr. Wickel, is that correct?

"A. Well as near as I know it was; he had the water in the ditch and whenever he would get through with it and I was dry he would turn me a stream and I would use it and get through as quick as possible and turn it back again; there was quite a lot of water in the creek for everybody and I never needed any water at all."

MR. WILLARD WICKEL, plaintiff herein:

"A. When I was using the water on the south side and got through with it, Udy's water was taken out of a mile ditch and put into my north ditch and I used his water on the north side and he used my water on the south side.

"Q. In the exchange to whom was the water charged that came through the Rice Lessey Ditch?

"A. Charged to me."

DR. MORGAN, prior owner of Wickel land:

"Q. Did the owner of the land that is known as the Udy land or the old Merritt Beecher farm use any water through that ditch, Doctor, during the years you were there?

"A. Used it as I keep in mind more by permission.

"Q. And by permission of whom?

"A. Mr. Rice or his renter."

MR. SPENCER, watermaster 1910:

"Q. And you would say during that year the Beecher land received no water at all through the Rice Lessey Ditch?

"A. No sir, they did not."

MR. BEECHER, prior owner of Udy land;

"Q. Do you remember whether in 1910 you irrigated any part of the land from the Rice Lessey Ditch?

"A. Yes, I irrigated the tract under the present ditch, most of it."

Respondent's witnesses testified as follows:

MR. HEPWORTH, employed on Udy land by Beecher:

"A. In my judgment he (Mr. Beecher) used more than 12 inches of water through the Rice Lessey Ditch.

"Q. Did he use sufficient of the water through the Rice Lessey Ditch to adequately irrigate the land lying north of that ditch and south of the middle ditch?

"A. I never seen any crop failures there."

MR. CARROLL, worked on Udy land for five years beginning about 1898:

"A. We got our water that we took out of Cassia Creek out of the Rice Lessey Ditch."

MR. TAYLOR, owner of the Udy land 1910 to 1923:

"A. That land that lies south of the Middle ditch and north of the Rice Lessey Ditch was irrigated every year by water obtained through the Rice Lessey Ditch.

"Q. Did you use water through that ditch at the same time Mr. Rice was using the water?

"A. Not really to irrigate; I have used water to irrigate up around the house several times while he had water, just take a little more in and run it over the end where he was irrigating; Mr. Rice and I got along pretty well, never had anything to complain about at all."

MR. PETTINGILL, tenant on Udy land 1926:

"A. During the year 1926 I diverted and conveyed through that ditch (Rice Lessey) and used from that ditch water for the irrigation of that land (Udy's).

"A. It was Wickel's stream that he (Udy) was using on his place."

MR. DARRINGTON, joined as defendant below:

"A. I have seen water being used through the Rice Lessey Ditch by Udy in 1932, '33, and '34."

MR. UDY, respondent herein:

"Q. Have you ever used water through that ditch for the purpose of irrigation?

"A. Yes, sir.

"Q. Assume Mr. Udy, you have testified you have irrigated the land lying north of the Rice Lessey Ditch and south of the Middle Ditch through the Rice Lessey Ditch, tell me whether that land can be irrigated through any other ditch?

"A. No, sir, it cannot.

"Q. Why?

"A. On account of the elevation.

"Q. Have you had that land in cultivation every year?

"A. Yes, sir.

"Q. Have you irrigated it every year?

"A. Yes sir.

"Q. What is the approximate amount of water, volume of the stream you received during the 7 or 8 days it takes you to irrigate that land?

"A. Oh 60 to 75 inches.

"Q. Mr. Udy, have you been acquainted with this land before you purchased it?

"A. Yes I have.

"Q. Have you worked on it?

"A. Yes, I have, hayed on it.

"Q. During what years, do you remember?

"A. Oh about '15, '16, until '19.

"Q. While you were there did you ever see any water diverted through the Rice Lessey Ditch and used on the land between it and the Middle Ditch?

"A. Yes, sir.

"Q. During all the years, do you remember?

"A. Well, practically every year."

These facts thus stand out as supported by sufficient evidence to sustain the trial court in making them in effect ultimate findings:

That respondent's 18 acres south of Cassia Creek and north of the Rice-Lessey Ditch in the NE¼ of the SW¼ are incapable of producing a crop without irrigation; that they have practically all of the time, since 1893 at least, produced crops; that they have been irrigated; that for a number of years last past, at least for more than a prescriptive period, respondent's 1887 right has not afforded water for the irrigation of these 18 acres; that 1873 water has been diverted to this land by Udy and his predecessors for more than 5 year continuous periods with knowledge of claims by Taylor, 1911 to 1923, and Udy, 1927 to 1934, that they had the right to carry 1873 water in the Rice-Lessey Ditch when Wickel and/or Morgan were not carrying their water therein.

MR. TAYLOR:

"Q. Did you claim a right to divert the water through that ditch (Rice Lessey) for the irrigation of that land?

"A. Yes, we claimed a right; the fact of the matter is the first few years that was never considered.

"Q. Did you ever have any difficulty getting your water the first few years?

"A. I don't remember having trouble until along about 1920; Mr. Rice always claimed priority right in the ditch but it didn't make any difference to us as long as we got our rights; there never was any question about us getting our water.

"Q. When you used the water through that ditch for the irrigation of the farming land, when did you usually use it after Mr. Rice had finished?

"A. Well, Mr. Rice's place was mostly meadow and he would sometimes irrigate twice before we irrigated; he would generally irrigate first, there was never any question came up about us having any right to use the water through there; of course he always claimed the priority right; we never tried to use the water just the same time because it wasn't large enough to carry two streams and handle it.

"Q. Under the system of irrigation practiced in that community when you were using water through the Rice-Lessey Ditch, where would Mr. Rice be irrigating?

"A. Oh I don't know, he had the north side water on the island.

"Q. Was there ever any arrangement between you and him for the exchange or rotation of water or ditches?

"A. There was not.

"Q. And your cordial relations with Mr. Rice continued— I take it during the time you remained on the place.

"A. They did.

"Q. About when did he leave the property?

"A. I couldn't remember exactly but I heard Mr. Wickel say along in 1920, I thought it was earlier than that, it wasn't much earlier because he was quite prominent there when the war was on putting over drives to get Liberty Bonds and such, so it was 1919 or 1920 before he left, I don't know exactly.

"Q. Who succeeded him on the Rice place?

"A. Mr. Wickel.

"Q. Did you after that have any difficulty over the water?

"A. Oh not much, one summer there, in 1920, we had the water and Mr. Cursey shut it off.

"Q. What did you do then?

"A. I went up and talked with him and he wouldn't turn it back in so I came down and talked with Mr. Lowe here.

"Q. What was then done?

"A. He gave me a demand on them, I think he called it, to serve on Mr. Cursey, and I didn't lose much time in serving the same.

"Q. What happened then?

"A. Mr. Cursey wanted to think about it a little while and I told him it was all right with me, and he went up the creek and was gone quite a while and came back and turned the water in.

"Q. And how long did the water remain on?

"A. It remained full stream—it was the 19th of August he turned it on as I remember, about 11 o'clock I believe, and they went to Twin Falls that afternoon and was gone the next day and part of the next day. Shortly after they

came- back my stream started to diminish, kept getting smaller and smaller and Howard Hubbard and I went up and turned it back in.

"Q. You turned it back in?

"A. Yes, it was going to the creek, wasted down to the measuring device there, it stayed in, probably, oh I don't know, three, four or five days after that.

"Q. And when you would be using the south ditch for the irrigation of your land would Mr. Wickel be irrigating any on his land?

"A. I presume he was irrigating his place, yes, on the other points of diversion.

"Q. Well did you have any agreement or understanding with Mr. Wickel that while you were irrigating through the Rice Lessey he would be using a head of water through the north ditch?

"A. We did not."

MR. UDY:

"Q. Have you experienced any difficulty in obtaining water through the Rice Lessey Ditch?

"A. I have.

"Q. Tell us what those difficulties are?

"A. Well they have objected to me using it through there and they are all using it practically for a head ditch, have done up to '33 and its hard to get a stream to come down that entire ditch and keep it even, its up and down and half the time you don't have half your water there.

"Q. Have you ever been obliged to go up the ditch?

"A. Yes, sir, several times."

The ditch has not been and is not now of sufficient capacity to carry the water of appellants and respondent at the same time.

Thus under *Bachman v. Reynolds Irrigation Dist., supra,* appellants were entitled to an injunction restraining respondent from using the Rice-Lessey Ditch when appellants Wickel and/or Morgan were using it, and the district court was not justified in awarding appellants no injunctive relief.

The decree therefore should be modified, thus, that respondent be restrained from using the Rice-Lessey Ditch only when appellants Wickel and/or Morgan, or their suc-

cessors in interest in the Rice-Lessey Ditch, are reasonably using the Rice-Lessey Ditch.

Each party to pay the cost of their respective briefs. The balance of the costs to be divided.

Holden, C. J., and Morgan and Ailshie, JJ., concur.

Budge, J., neither sat nor took part in this opinion.

Petition for rehearing denied.