NEVADA *v.* UNITED STATES ET AL.

No. 81–2245.   Argued April 27, 1983—Decided June 24, 1983*

*Together with No. 81–2276, *Truckee-Carson Irrigation District* v. *United States et al.;* and No. 82–38, *Pyramid Lake Paiute Tribe of Indians* v. *Truckee-Carson Irrigation District et al.*, also on certiorari to the same court.

*E. Barrett Prettyman*, Special Deputy Attorney General of Nevada, argued the cause for petitioner in No. 81–2245. With him on the briefs were *Brian McKay*, Attorney General, *Richard H. Bryan*, former Attorney General, *Larry D. Struve*, Chief Deputy Attorney General, and *John W. Hoffman* and *Harold A. Swafford*, Special Deputy Attorneys General. *Frederick G. Girard* argued the cause for petitioner in No. 81–2276. With him on the briefs were *James W. Johnson, Jr.*, and *Janet K. Goldsmith*. Messrs. Bryan, Prettyman, Hoffman, Swafford, Johnson, and Girard, and Ms. Goldsmith filed a postargument memorandum for petitioners in Nos. 81–2245 and 81–2276. *Robert S. Pelcyger* argued the cause for petitioner in No. 82–38. With him on the briefs were *Michael R. Thorp, Scott B. McElroy*, and *Jeanne S. Whiteing.*

*Edwin S. Kneedler* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Dinkins, Deputy Solicitor General Claiborne, Robert L. Klarquist*, and *Dirk D. Snel.* Messrs. McKay, Prettyman, Hoffman, and Swafford filed a brief for respondent State of Nevada in No. 82–38. *Louis S. Test, Steven P. Elliott*, and *Mills Lane* filed a brief for respondents City of Reno et al. in No. 82–38. Messrs. Johnson and Girard and Ms. Goldsmith filed a brief for respondent Truckee–Carson Irrigation District in No. 82–38. Messrs. Pelcyger, Thorp, and McElroy filed a brief for respondent Pyramid Lake Paiute Tribe of Indians in Nos. 81–2245 and 81–2276. *Richard W. Blakey, Gordon H. DePaoli*, and *John Madariaga* filed a brief for respondent Sierra Pacific Power Co. in No. 82–38.†

---

†Briefs of *amici curiae* urging reversal were filed for the State of New Mexico by *Jeff Bingaman*, Attorney General, and *Peter Thomas White*, Special Assistant Attorney General; and for the State of Alabama et al. by *Charles A. Graddick*, Attorney General of Alabama, *Linley E. Pearson*,

JUSTICE REHNQUIST delivered the opinion of the Court.

In 1913 the United States sued to adjudicate water rights to the Truckee River for the benefit of the Pyramid Lake Indian Reservation and the planned Newlands Reclamation Project. Thirty-one years later, in 1944, the United States District Court for the District of Nevada entered a final decree in the case pursuant to a settlement agreement. In 1973 the United States filed the present action in the same court on behalf of the Pyramid Lake Indian Reservation, seeking additional water rights to the Truckee River. The issue thus presented is whether the Government may partially undo the 1944 decree, or whether principles of res judicata prevent it, and the intervenor Pyramid Lake Paiute Tribe, from litigating this claim on the merits.

---

Attorney General of Indiana, *William J. Guste, Jr.*, Attorney General of Louisiana, *William A. Allain*, Attorney General of Mississippi, *Paul L. Douglas*, Attorney General of Nebraska, and *Jan Eric Cartwright*, Attorney General of Oklahoma.

Briefs of *amici curiae* urging affirmance were filed for the Sierra Club et al. by *John D. Leshy, Joseph L. Sax*, and *Ralph W. Johnson;* and for the Hoopa Valley Tribe et al. by *Alan C. Stay* and *Steven S. Anderson*.

Briefs of *amici curiae* were filed for the State of Washington et al. by *Kenneth O. Eikenberry*, Attorney General of Washington, *Charles B. Roe, Jr.*, Senior Assistant Attorney General, and *Robert E. Mack*, Assistant Attorney General, *David H. Leroy*, Attorney General of Idaho, and *Phillip J. Rassier* and *Neil L. Tillquist*, Deputy Attorneys General; for the State of Arizona et al. by *Mark V. Meierhenry*, Attorney General of South Dakota, *Mark White*, Attorney General of Texas, *David L. Wilkinson*, Attorney General of Utah, *Steven F. Freudenthal*, Attorney General of Wyoming, *Robert K. Corbin*, Attorney General of Arizona, *George Deukmejian*, Attorney General of California, *Michael T. Greely*, Attorney General of Montana, *Robert O. Wefald*, Attorney General of North Dakota, and *David Frohnmayer*, Attorney General of Oregon; for the Salt River Project Agricultural Improvement and Power District et al. by *Frederick J. Martone;* and for the City of Los Angeles et al. by *R. L. Knox, Jr., Maurice C. Sherrill, Justin McCarthy, Carl Boronkay, Jerome C. Muys, Roberta L. Halladay, Ira Reiner, Gilbert W. Lee, John W. Witt, Joseph Kase, Jr.*, and *Roy H. Mann;* and for Yakima Valley Canal Co. et al. by *Donald H. Bond*.

I

Nevada has, on the average, less precipitation than any other State in the Union. Except for drainage in the southeastern part of the State into the Colorado River, and drainage in the northern part of the State into the Columbia River, the rivers that flow in Nevada generally disappear into "sinks." Department of Agriculture Yearbook, Climate and Man (1941). The present litigation relates to water rights in the Truckee River, one of the three principal rivers flowing through west central Nevada. It rises in the High Sierra in Placer County, Cal., flows into and out of Lake Tahoe, and thence down the eastern slope of the Sierra Nevada mountains. It flows through Reno, Nev., and after a course of some 120 miles debouches into Pyramid Lake, which has no outlet.

It has been said that Pyramid Lake is "widely considered the most beautiful desert lake in North America [and that its] fishery [has] brought it worldwide fame. A species of cutthroat trout . . . grew to world record size in the desert lake and attracted anglers from throughout the world." S. Wheeler, The Desert Lake 90–92 (1967). The first recorded sighting of Pyramid Lake by non-Indians occurred in January 1844 when Captain John C. Frémont and his party camped nearby. In his journal Captain Frémont reported that the lake "broke upon our eyes like the ocean" and was "set like a gem in the mountains." 1 The Expeditions of John Charles Frémont 604–605 (D. Jackson & M. Spence eds. 1970). Commenting upon the fishery, as well as the Pyramid Lake Indians that his party was camping with, Captain Frémont wrote:

"An Indian brought in a large fish to trade, which we had the inexpressible satisfaction to find was a salmon trout; we gathered round him eagerly. The Indians were amused with our delight, and immediately brought in numbers; so that the camp was soon stocked. Their flavor was excellent—superior, in fact, to that of any fish I

have ever known. They were of extraordinary size—about as large as the Columbia river salmon—generally from two to four feet in length." *Id.*, at 609.

When first viewed by Captain Frémont in early 1844, Pyramid Lake was some 50 miles long and 12 miles wide. Since that time the surface area of the lake has been reduced by about 20,000 acres.

The origins of the cases before us are found in two historical events involving the Federal Government in this part of the country. First, in 1859 the Department of the Interior set aside nearly half a million acres in what is now western Nevada as a reservation for the area's Paiute Indians. In 1874 President Ulysses S. Grant by Executive Order confirmed the withdrawal as the Pyramid Lake Indian Reservation. The Reservation includes Pyramid Lake, the land surrounding it, the lower reaches of the Truckee River, and the bottom land alongside the lower Truckee.

Then, with the passage of the Reclamation Act of 1902, 32 Stat. 388, the Federal Government was designated to play a more prominent role in the development of the West. That Act directed the Secretary of the Interior to withdraw from public entry arid lands in specified Western States, reclaim the lands through irrigation projects, and then to restore the lands to entry pursuant to the homestead laws and certain conditions imposed by the Act itself. Accordingly, the Secretary withdrew from the public domain approximately 200,000 acres in western Nevada, which ultimately became the Newlands Reclamation Project. The Project was designed to irrigate a substantial area in the vicinity of Fallon, Nev., with waters from both the Truckee and the Carson Rivers.

The Carson River, like the Truckee, rises on the eastern slope of the High Sierra in Alpine County, Cal., and flows north and northeast over a course of about 170 miles, finally disappearing into Carson sink. The Newlands Project accomplished the diversion of water from the Truckee River to

the Carson River by constructing the Derby Diversion Dam on the Truckee River, and constructing the Truckee Canal through which the diverted waters would be transported to the Carson River. Experience in the early days of the Project indicated the necessity of a storage reservoir on the Carson River, and accordingly Lahontan Dam was constructed and Lahontan Reservoir behind that dam was created. The combined waters of the Truckee and Carson Rivers impounded in Lahontan Reservoir are distributed for irrigation and related uses on downstream lands by means of lateral canals within the Newlands Reclamation Project.

Before the works contemplated by the Project went into operation, a number of private landowners had established rights to water in the Truckee River under Nevada law. The Government also asserted on behalf of the Indians of the Pyramid Lake Indian Reservation a reserved right under the so-called "implied-reservation-of-water" doctrine set forth in *Winters* v. *United States*, 207 U. S. 564 (1908).[1] The United States therefore filed a complaint in the United States District Court for the District of Nevada in March 1913, commencing what became known as the *Orr Ditch* litigation. The Government, for the benefit of both the Project and the Pyramid Lake Reservation, asserted a claim to 10,000 cubic feet of water per second for the Project and a claim to 500 cubic feet per second for the Reservation. The complaint named as defendants all water users on the Truckee River in Nevada. The Government expressly sought a final decree quieting title to the rights of all parties.

---

[1] In *Winters* v. *United States*, this Court construed the agreements creating the Fort Belknap Indian Reservation. While the agreements did not purport to claim any water rights from the Milk River, this Court held that the Federal Government had impliedly reserved a right to the amount of river water necessary to effectuate the purposes of the agreements. Since then we have recognized and applied the *Winters* doctrine in other contexts, see *United States* v. *New Mexico*, 438 U. S. 696, 698 (1978); *Cappaert* v. *United States*, 426 U. S. 128, 138 (1976), including when interpreting an Executive Order that created an Indian reservation, see *Arizona* v. *California*, 373 U. S. 546, 598 (1963).

Following several years of hearings, a Special Master issued a report and proposed decree in July 1924. The report awarded the Reservation an 1859 priority date in the Truckee River for 58.7 second-feet and 12,412 acre-feet annually of water to irrigate 3,130 acres of Reservation lands.[2] The Project was awarded a 1902 priority date for 1,500 cubic feet per second to irrigate, to the extent the amount would allow,[3] 232,800 acres of land within the Project. In February 1926 the District Court entered a temporary restraining order declaring the water rights as proposed by the Special Master. "One of the primary purposes" for entering a temporary order was to allow for an experimental period during which modifications of the declared rights could be made if necessary. App. to Pet. for Cert. in No. 81–2245, p. 186a (hereafter Nevada App.).

Not until almost 10 years later, in the midst of a prolonged drought, was interest stimulated in concluding the *Orr Ditch* litigation. Settlement negotiations were commenced in 1934 by the principal organizational defendants in the case, Washoe County Water Conservation District and the Sierra Pacific Power Co., and the representatives of the

---

[2] Congress had passed a provision in 1904 authorizing the Secretary of the Interior to include in the Newlands Reclamation Project lands located in the Pyramid Lake Indian Reservation. Act of Apr. 21, 1904, § 26, 33 Stat. 225. If such lands were included, each individual Indian living on the Reservation was to be allotted five acres of the reclaimed land. The Special Master's report, and the District Court's temporary order, provided additional water rights for the Reservation in the event the allotments were made. Congress abandoned the plan, however, before it was ever implemented. Act of June 18, 1934, § 1, 48 Stat. 984. See 649 F. 2d 1286, 1294 (CA9 1981).

[3] Notwithstanding the Project's 1902 priority, it was awarded far less water than the Government had claimed. While it was recognized that the 1,500 cubic feet per second, together with the water obtained from the Carson River, would not irrigate the Project's entire 232,800 acres, in the subsequent settlement negotiations the Truckee-Carson Irrigation District, then representing the interest of the Project, agreed to this lesser amount. The Court of Appeals noted that "there has never been irrigated more than about 65,000 acres of land in the Project." *Id.*, at 1292, n. 1.

Project and the Reservation. The United States still acted on behalf of the Reservation's interests, but the Project was now under the management of the Truckee-Carson Irrigation District (TCID).[4] The defendants and TCID proposed an agreement along the lines of the temporary restraining order. The United States objected, demanding an increase in the Reservation's water rights to allow for the irrigation of an additional 2,745 acres of Reservation land. After some resistance, the Government's demand was accepted and a settlement agreement was signed on July 1, 1935. The District Court entered a final decree adopting the agreement on September 8, 1944.[5] No appeal was taken. Thus, 31 years after its inception the *Orr Ditch* litigation came to a close.

On December 21, 1973, the Government instituted the action below seeking additional rights to the Truckee River for the Pyramid Lake Indian Reservation; the Pyramid Lake Paiute Tribe was permitted to intervene in support of the United States. The Government named as defendants all persons presently claiming water rights to the Truckee River and its tributaries in Nevada. The defendants include the defendants in the *Orr Ditch* litigation and their successors, approximately 3,800 individual farmers that own land in the Newlands Reclamation Project, and TCID. The District Court certified the Project farmers as a class and directed TCID to represent their interests.[6]

---

[4] The newly formed Truckee-Carson Irrigation District had assumed operational control of the Newlands Project pursuant to a contract entered into with the Government on December 18, 1926.

[5] The 9-year gap between the agreement and the final decree was attributable to a provision in the agreement that it would be submitted to the District Court only after completion of the new upstream storage reservoir.

[6] The Government did not name as defendants in its original complaint the Project landowners. Citing the absence of these claimants, the named defendants moved to dismiss for failure to join indispensable parties. Subsequently, the Government moved to amend its complaint so as to join the Project landowners as a class. After a hearing, the motion to amend was granted. App. 193–204.

In its complaint the Government purported not to dispute the rights decreed in the *Orr Ditch* case. Instead, it alleged that *Orr Ditch* determined only the Reservation's right to "water for irrigation," Nevada App. 157a, not the claim now being asserted for "sufficient waters of the Truckee River . . . [for] the maintenance and preservation of Pyramid Lake, [and for] the maintenance of the lower reaches of the Truckee River as a natural spawning ground for fish," *id.*, at 155a–156a. The complaint further averred that in establishing the Reservation the United States had intended that the Pyramid Lake fishery be maintained. Since the additional water now being claimed is allegedly necessary for that purpose, the Government alleged that the Executive Order creating the Reservation must have impliedly reserved a right to this water.[7]

The defendants below asserted res judicata as an affirmative defense, saying that the United States and the Tribe were precluded by the *Orr Ditch* decree from litigating this claim. Following a separate trial on this issue, the District Court sustained the defense and dismissed the complaint in its entirety.

In its decision, the District Court first determined that all of the parties in this action were parties, or in privity with

[7] Between 1920 and 1940 the surface area of Pyramid Lake was reduced by about 20,000 acres. The decline resulted in a delta forming at the mouth of the Truckee that prevented the fish indigenous to the lake, the Lahontan cutthroat trout and the cui-ui, from reaching their spawning grounds in the Truckee River, resulting in the near extinction of both species. Efforts to restore the fishery have occurred since that time. Pyramid Lake has been stabilized for several years and, augmented by passage of the Washoe Project Act of 1956, § 4, 70 Stat. 777, the lake is being restocked with cutthroat trout and cui-ui. Fish hatcheries operated by both the State of Nevada and the United States have been one source for replenishing the lake. In 1976 the Marble Bluff Dam and Fishway was completed, enabling the fish to bypass the delta to their spawning grounds in the Truckee. Both the District Court and Court of Appeals observed that "these restoration efforts 'appear to justify optimism for eventual success.'" 649 F. 2d, at 1294. See Nevada App. 184a.

parties, in the *Orr Ditch* case. The District Court then found that the *Orr Ditch* litigation "was intended by all concerned, lawyers, litigants and judges, as a general all inclusive water adjudication suit which sought to adjudicate all rights and claims in and to the waters of the Truckee . . . and required all parties to fully set up their respective water right claims." Nevada App. 185a. The court determined that in accordance with this general intention, the United States had intended in *Orr Ditch* "to assert as large a water right as possible for the Indian reservation." Nevada App. 185a. The District Court further explained:

> "[T]he cause of action sought to be asserted in this proceeding by the plaintiff and the Tribe is the same quiet title cause of action asserted by the plaintiff in *Orr Ditch* for and on behalf of the Tribe and its members, that is, a *Winters* implied and reserved water right for the benefit of the reservation, with a priority date of December 8, 1859, from a single source of water supply, i. e., the Truckee Watershed. The plaintiff and the Tribe may not litigate several different types of water use claims, all arising under the *Winters* doctrine and all derived from the same water source in a piece-meal fashion. There was but one cause of action in equity to quiet title in plaintiff and the Tribe based upon the *Winters* reserved right theory." *Id.*, at 188a.

The Court of Appeals for the Ninth Circuit affirmed in part and reversed in part. 649 F. 2d 1286 (1981), modified, 666 F. 2d 351 (1982). The Court of Appeals agreed that the causes of action asserted in *Orr Ditch* and the instant litigation are the same and that the United States and the Tribe cannot relitigate this cause of action with the *Orr Ditch* defendants or subsequent appropriators of the Truckee River. But the Court of Appeals found that the *Orr Ditch* decree did not conclude the dispute between the Tribe and the owners of Newlands Project lands. The court said that litigants are not to be bound by a prior judgment unless they were adver-

saries under the earlier pleadings or unless the specific issue in dispute was actually litigated in the earlier case and the court found that neither exception applied here.

The Court of Appeals conceded that "[a] strict adversity requirement does not necessarily fit the realities of water adjudications." 649 F. 2d, at 1309. Nevertheless, the court found that since neither the Tribe nor the Project landowners were parties in *Orr Ditch* but instead were both represented by the United States, and since their interests may have conflicted in that proceeding, the court would not find that the Government had intended to bind these nonparties *inter se* absent a specific statement of adversity in the pleadings. We granted certiorari in the cases challenging the Court of Appeals' decision, 459 U. S. 904 (1982), and we now affirm in part and reverse in part.

## II

The Government opens the "Summary of Argument" portion of its brief by stating: "The court of appeals has simply permitted a reallocation of the water decreed in *Orr Ditch* to a single party—the United States—from reclamation uses to a Reservation use with an earlier priority. The doctrine of res judicata does not bar a single party from reallocating its water in this fashion . . . ." Brief for United States 21. We are bound to say that the Government's position, if accepted, would do away with half a century of decided case law relating to the Reclamation Act of 1902 and water rights in the public domain of the West.

It is undisputed that the primary purpose of the Government in bringing the *Orr Ditch* suit in 1913 was to secure water rights for the irrigation of land that would be contained in the Newlands Project, and that the Government was acting under the aegis of the Reclamation Act of 1902 in bringing that action.[8]  Section 8 of that Act provides:

---

[8] In its amended complaint in *Orr Ditch*, the Government plainly stated that the Newlands Project was initiated pursuant to the Reclamation Act, and that the litigation was designed to quiet title to the Government's right

"That nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof: *Provided,* That the right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right." 32 Stat. 390.

In *California* v. *United States,* 438 U. S. 645 (1978), we described in greater detail the history and structure of the Reclamation Act of 1902, and stated:

"The projects would be built on federal land and the actual construction and operation of the projects would be in the hands of the Secretary of the Interior. But *the Act clearly provided that state water law would control in the appropriation and later distribution of the water." Id.,* at 664 (emphasis added).

In two leading cases, *Ickes* v. *Fox,* 300 U. S. 82 (1937), and *Nebraska* v. *Wyoming,* 325 U. S. 589 (1945), this Court has

---

to the amount of water necessary to irrigate the lands set aside for the Project. Nevada App. 2a–5a. The final decree, entered pursuant to the settlement agreement, gave the United States a specified amount of water "in the Truckee River for the irrigation of 232,800 acres of lands on the Newlands Project, for storage in the Lahontan Reservoir, for generating power, for supplying the inhabitants of cities and towns on the project and for domestic and other purposes . . . ." *Id.,* at 59a.

discussed the beneficial ownership of water rights in irrigation projects built pursuant to the Reclamation Act. In *Ickes* v. *Fox*, the Court said:

> "Although the government diverted, stored and distributed the water, the contention of petitioner that thereby ownership of the water or water-rights became vested in the United States is not well founded. Appropriation was made not for the use of the government, but, under the Reclamation Act, for the use of the land owners; and by the terms of the law and of the contract already referred to, the water-rights became the property of the land owners, wholly distinct from the property right of the government in the irrigation works. Compare *Murphy* v. *Kerr*, 296 Fed. 536, 544, 545. The government was and remained simply a carrier and distributor of the water *(ibid.)*, with the right to receive the sums stipulated in the contracts as reimbursement for the cost of construction and annual charges for operation and maintenance of the works. As security therefor, it was provided that the government should have a lien upon the lands *and the water rights* appurtenent thereto—a provision which in itself imports that the water-rights belong to another than the lienor, that is to say, to the land owner.
>
> "The federal government, as owner of the public domain, had the power to dispose of the land and water composing it together or separately; and by the Desert Land Act of 1877 (c. 107, 19 Stat. 377), if not before, Congress had severed the land and waters constituting the public domain and established the rule that for the future the lands should be patented separately. Acquisition of the government title to a parcel of land was not to carry with it a water-right; but all non-navigable waters were reserved for the use of the public under the

laws of the various arid-land states. *California Power Co.* v. *Beaver Cement Co.*, 295 U. S. 142, 162. And in those states, generally, including the State of Washington, it long has been established law that the right to the use of water can be acquired only by prior appropriation for a beneficial use; and that such right when thus obtained is a property right, which, when acquired for irrigation, becomes, by state law and here by express provision of the Reclamation Act as well, part and parcel of the land upon which it is applied." 300 U. S., at 94–96.

In *Nebraska* v. *Wyoming*, the Court stated:

"The Secretary of the Interior pursuant to § 3 of the Reclamation Act withdrew from public entry certain public lands in Nebraska and Wyoming which were required for the North Platte Project and the Kendrick Project. Initiation of both projects was accompanied by filings made pursuant to § 8 in the name of the Secretary of the Interior for and on behalf of the United States. Those filings were accepted by the state officials as adequate under state law. They established the priority dates for the projects. There were also applications to the States for permits to construct canals and ditches. They described the land to be served. The orders granting the applications fixed the time for completion of the canal, for application of the water to the land, and for proof of appropriation. Individual water users contracted with the United States for the use of project water. These contracts were later assumed by the irrigation districts. Irrigation districts submitted proof of beneficial use to the state authorities on behalf of the project water users. The state authorities accepted that proof and issued decrees and certificates in favor of the individual water users. The certificates named as appropriators the individual landowners. They designated the number of acres included, the use for which

the appropriation was made, the amount of the appropriation, and the priority date. The contracts between the United States and the irrigation districts provided that after the stored water was released from the reservoir it was under the control of the appropriate state officials.

"All of these steps make plain that those projects were designed, constructed and completed according to the pattern of state law as provided in the Reclamation Act. We can say here what was said in *Ickes* v. *Fox, supra,* pp. 94–95: 'Although the government diverted, stored and distributed the water, the contention of petitioner that thereby ownership of the water or water-rights became vested in the United States is not well founded. Appropriation was made not for the use of the government, but, under the Reclamation Act, for the use of the land owners; and by the terms of the law and of the contract already referred to, the water-rights became the property of the land owners, wholly distinct from the property right of the government in the irrigation works. Compare *Murphy* v. *Kerr,* 296 Fed. 536, 544, 545. The government was and remained simply a carrier and distributor of the water *(ibid.),* with the right to receive the sums stipulated in the contracts as reimbursement for the cost of construction and annual charges for operation and maintenance of the works.'

"The property right in the water right is separate and distinct from the property right in the reservoirs, ditches or canals. The water right is appurtenant to the land, the owner of which is the appropriator. The water right is acquired by perfecting an appropriation, *i. e.,* by an actual diversion followed by an application within a reasonable time of the water to a beneficial use. See *Murphy* v. *Kerr,* 296 F. 536, 542, 544, 545; *Commonwealth Power Co.* v. *State Board,* 94 Neb. 613, 143 N. W. 937; *Kersenbrock* v. *Boyes,* 95 Neb. 407, 145

N. W. 837.   Indeed § 8 of the Reclamation Act provides
as we have seen that 'the right to the use of water ac-
quired under the provisions of this Act shall be appurte-
nant to the land irrigated, and beneficial use shall be the
basis, the measure, and the limit of the right.'"   325
U. S., at 613–614.

The law of Nevada, in common with most other Western
States, requires for the perfection of a water right for agri-
cultural purposes that the water must be beneficially used by
actual application on the land.   *Prosole* v. *Steamboat Canal
Co.*, 37 Nev. 154, 159–161, 140 P. 720, 722 (1914).   Such a
right is appurtenant to the land on which it is used.   *Id.*, at
160–161, 140 P., at 722.

In the light of these cases, we conclude that the Govern-
ment is completely mistaken if it believes that the water
rights confirmed to it by the *Orr Ditch* decree in 1944 for use
in irrigating lands within the Newlands Reclamation Project
were like so many bushels of wheat, to be bartered, sold, or
shifted about as the Government might see fit.   Once these
lands were acquired by settlers in the Project, the Govern-
ment's "ownership" of the water rights was at most nominal;
the beneficial interest in the rights confirmed to the Govern-
ment resided in the owners of the land within the Project to
which these water rights became appurtenant upon the appli-
cation of Project water to the land.   As in *Ickes* v. *Fox* and
*Nebraska* v. *Wyoming*, the law of the relevant State and the
contracts entered into by the landowners and the United
States make this point very clear.[9]

---

[9] The contracts entered into between the Project landowners and the
United States, or TCID acting pursuant to its agreement with the Govern-
ment, are similar to those addressed by the Court in *Ickes* v. *Fox* and
*Nebraska* v. *Wyoming*.   Five different contracts have been used since the
creation of the Newlands Project.   Two of the forms provide for an ex-
change of a vested water right by the landowner in return for the right to
use Project water.   The remaining three provide the landowner a water
right in that amount which may be beneficially applied to a specified tract

The Government's brief is replete with references to its fiduciary obligation to the Pyramid Lake Paiute Tribe of Indians, as it properly should be. But the Government seems wholly to ignore in the same brief the obligations that necessarily devolve upon it from having mere title to water rights for the Newlands Project, when the beneficial ownership of these water rights resides elsewhere.

Both the briefs of the parties and the opinion of the Court of Appeals focus their analysis of res judicata on provisions relating to the relationship between private trustees and fiduciaries, especially those governing a breach of duty by the fiduciary to the beneficiary. While these undoubtedly provide useful analogies in cases such as these, they cannot be regarded as finally dispositive of the issues. This Court has long recognized "the distinctive obligation of trust incumbent upon the Government" in its dealings with Indian tribes, see, *e. g.*, *Seminole Nation* v. *United States*, 316 U. S. 286, 296 (1942). These concerns have been traditionally focused on the Bureau of Indian Affairs within the Department of the Interior. *Poafpybitty* v. *Skelly Oil Co.*, 390 U. S. 365, 374 (1968). See 25 U. S. C. § 1.

---

of land. App. 197, n. 2. One of these latter types, and the one the District Court found was most commonly used on the Newlands Project, provides in part:

"IN PURSUANCE of the provisions of the act of June 17, 1902 (32 Stat., 388), and acts amendatory thereof or supplementary thereto, especially the act of August 9, 1912 (37 Stat., 265), and the act of August 13, 1914 (38 Stat., 686), all herein styled the reclamation law, and the rules and regulations established under said law, and the terms of that certain Contract between the United States of America and the Truckee-Carson Irrigation District, dated Dec. 18th, 1926, and subject to the conditions named in this instrument, application is hereby made to the TRUCKEE-CARSON IRRIGATION DISTRICT, herein styled District, by the UNDERSIGNED, herein styled Applicant, *for a permanent water right for the irrigation of and to be appurtenant to all of the irrigable area now or hereafter developed under the above-named project within the tract of land described in paragraph 2.*" 4 Record, Doc. No. 92, Exhibit C (emphasis added).

But Congress in its wisdom, when it enacted the Reclamation Act of 1902, required the Secretary of the Interior to assume substantial obligations with respect to the reclamation of arid lands in the western part of the United States. Additionally, in § 26 of the Act of Apr. 21, 1904, 33 Stat. 225, Congress provided for the inclusion of irrigable lands of the Pyramid Lake Indian Reservation within the Newlands Project, and further authorized the Secretary, after allotting five acres of such land to each Indian belonging to the Reservation, to reclaim and dispose of the remainder of the irrigable Reservation land to settlers under the Reclamation Act.

Today, particularly from our vantage point nearly half a century after the enactment of the Indian Reorganization Act of 1934, 48 Stat. 984, 25 U. S. C. § 461 *et seq.*, it may well appear that Congress was requiring the Secretary of the Interior to carry water on at least two shoulders when it delegated to him both the responsibility for the supervision of the Indian tribes and the commencement of reclamation projects in areas adjacent to reservation lands. But Congress chose to do this, and it is simply unrealistic to suggest that the Government may not perform its obligation to represent Indian tribes in litigation when Congress has obliged it to represent other interests as well. In this regard, the Government cannot follow the fastidious standards of a private fiduciary, who would breach his duties to his single beneficiary solely by representing potentially conflicting interests without the beneficiary's consent. The Government does not "compromise" its obligation to one interest that Congress obliges it to represent by the mere fact that it simultaneously performs another task for another interest that Congress has obligated it by statute to do.

With these observations in mind, we turn to the principles of res judicata that we think are involved in this case.

## III

Recent cases in which we have discussed principles of estoppel by judgment include *Federated Department Stores,*

*Inc.* v. *Moitie,* 452 U. S. 394 (1981); *Allen* v. *McCurry,* 449 U. S. 90 (1980); *Brown* v. *Felsen,* 442 U. S. 127 (1979); *Montana* v. *United States,* 440 U. S. 147 (1979). But what we said with respect to this doctrine more than 80 years ago is still true today; it ensures "the very object for which civil courts have been established, which is to secure the peace and repose of society by the settlement of matters capable of judicial determination. Its enforcement is essential to the maintenance of social order; for, the aid of judicial tribunals would not be invoked for the vindication of rights of person and property, if . . . conclusiveness did not attend the judgments of such tribunals." *Southern Pacific R. Co.* v. *United States,* 168 U. S. 1, 49 (1897).[10]

Simply put, the doctrine of res judicata provides that when a final judgment has been entered on the merits of a case, "[i]t is a finality as to the claim or demand in controversy,

---

[10] The policies advanced by the doctrine of res judicata perhaps are at their zenith in cases concerning real property, land and water. See *Arizona* v. *California,* 460 U. S. 605, 620 (1983); *United States* v. *California & Oregon Land Co.,* 192 U. S. 355, 358–359 (1904); 2 A. Freeman, Law of Judgments § 874, pp. 1848–1849 (5th ed. 1925). As this Court explained over a century ago in *Minnesota Co.* v. *National Co.,* 3 Wall. 332 (1866):

"Where questions arise which affect titles to land it is of great importance to the public that when they are once decided they should no longer be considered open. Such decisions become rules of property, and many titles may be injuriously affected by their change. . . . [W]here courts vacillate and overrule their own decisions . . . affecting the title to real property, their decisions are retrospective and may affect titles purchased on the faith of their stability. Doubtful questions on subjects of this nature, when once decided, should be considered no longer doubtful or subject to change." *Id.,* at 334.

A quiet title action for the adjudication of water rights, such as the *Orr Ditch* suit, is distinctively equipped to serve these policies because "it enables the court of equity to acquire jurisdiction of all the rights involved and also of all the owners of those rights, and thus settle and permanently adjudicate in a single proceeding all the rights, or claims to rights, of all the claimants to the water taken from a common source of supply." 3 C. Kinney, Law of Irrigation and Water Rights § 1535, p. 2764 (2d ed. 1912).

concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." *Cromwell* v. *County of Sac*, 94 U. S. 351, 352 (1877). The final "judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever." *Commissioner* v. *Sunnen*, 333 U. S. 591, 597 (1948). See *Chicot County Drainage District* v. *Baxter State Bank*, 308 U. S. 371, 375, 378 (1940).[11]

To determine the applicability of res judicata to the facts before us, we must decide first if the "cause of action" which the Government now seeks to assert is the "same cause of action" that was asserted in *Orr Ditch;* we must then decide whether the parties in the instant proceeding are identical to or in privity with the parties in *Orr Ditch*. We address these questions in turn.

## A

Definitions of what constitutes the "same cause of action" have not remained static over time. Compare Restatement of Judgments § 61 (1942) with Restatement (Second) of Judgments § 24 (1982).[12] See generally 1B J. Moore, J. Lucas, &

---

[11] The corollary preclusion doctrine to res judicata is collateral estoppel. While the latter may be used to bar a broader class of litigants, it can be used only to prevent "relitigation of issues actually litigated" in a prior lawsuit. *Parklane Hosiery Co.* v. *Shore*, 439 U. S. 322, 326, n. 5 (1979). While the District Court concluded that the cause of action for reserved water rights asserted in *Orr Ditch* was the same as that asserted in the proceedings below, the District Court found, and the Court of Appeals agreed, that the specific issue of a "water right for fishery purposes" was not actually litigated in *Orr Ditch*. Nevada App. 189a; 649 F. 2d, at 1311. Therefore collateral estoppel was thought to be inapposite. It has been argued that these conclusions were erroneous, but because of our disposition of the cases we need not address this question.

[12] Under the first Restatement of Judgments § 61 (1942), causes of action were to be deemed the same "if the evidence needed to sustain the second action would have sustained the first action." In the Restatement (Sec-

T. Currier, Moore's Federal Practice ¶ 0.410[1], pp. 348–363 (1983). We find it unnecessary in these cases to parse any minute differences which these differing tests might produce, because whatever standard may be applied the only conclusion allowed by the record in the *Orr Ditch* case is that the Government was given an opportunity to litigate the Reservation's entire water rights to the Truckee, and that the Government intended to take advantage of that opportunity.

In its amended complaint in *Orr Ditch*, the Government averred:

"Until the several rights of the various claimants, parties hereto, including the United States, to the use of the

---

ond) of Judgments (1982), a more pragmatic approach, one "not capable of a mathematically precise definition," was adopted.  *Id.*, § 24, Comment *b.* Under this approach causes of actions are the same if they arise from the same "transaction"; whether they are products of the same "transaction" is to be determined by "giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Id.*, § 24.

The Tribe argues that the first Restatement of Judgments standard should control because it was the prevailing standard at the time of *Orr Ditch.*  While we find that the result would be the same under either version of the Restatement of Judgments, we nevertheless point out that the Tribe is somewhat mistaken in this argument.  Although the "same evidence" standard was "[o]ne of the tests" used at the time, *The Haytian Republic*, 154 U. S. 118, 125 (1894), it was not the only one.  For example, in *Baltimore S.S. Co.* v. *Phillips*, 274 U. S. 316 (1927), the Court concluded:

"A cause of action does not consist of facts, but of the unlawful violation of a right which the facts show.  The number and variety of the facts alleged do not establish more than one cause of action so long as their result, whether they be considered severally or in combination, is the violation of but one right by a single legal wrong. . . . 'The facts are merely the means, and not the end.  They do not constitute the cause of action, but they show its existence by making the wrong appear.  "The *thing*, therefore, which in contemplation of law as its *cause*, becomes a ground for action, is not the group of *facts* alleged in the declaration, bill, or indictment, *but the result of these in a legal wrong, the existence of which, if true, they conclusively evince."* ' *Chobanian* v. *Washburn Wire Company*, 33 R. I. 289, 302." *Id.*, at 321.

waters flowing in said river and its said tributaries in Nevada or used in Nevada have been settled, and the extent, nature, and order in time of each right to divert said waters from said river and its tributaries has been judicially determined the United States cannot properly protect its rights in and to the said waters, and to protect said rights otherwise than as herein sought if they could be protected would necessitate a multiplicity of suits." Nevada App. 10a.

The final decree in *Orr Ditch* clearly shows that the parties to the settlement agreement and the District Court intended to accomplish this purpose. The decree provided in part:

"The parties, persons, corporations, intervenors, grantees, successors in interest and substituted parties hereinbefore named, and their and each of their servants, agents, attorneys, assigns and all persons claiming by, through or under them and their successors, in or to the water rights or lands herein mentioned or described, are and *each of them is hereby forever enjoined and restrained from asserting or claiming any rights in or to the waters of the Truckee River or its tributaries, or the waters of any of the creeks or streams or other waters hereinbefore mentioned except the rights, specified, determined and allowed by this decree . . . .*" Nevada App. 145a (emphasis added).

We need not, however, stop here. For evidence more directly showing the Government's intention to assert in *Orr Ditch* the Reservation's full water rights, we return to the amended complaint, where it was alleged:

"16. On or about or prior to the 29th day of November, 1859, the Government of the United States, having for a long time previous thereto recognized the fact that certain Pah Ute and other Indians were, and they and

their ancestors had for many years been, residing upon and using certain lands in the northern part of the said Truckee River Valley and around said Pyramid Lake . . . and the said Government being desirous of protecting said Indians and their descendants in their homes, fields, pastures, fishing, and their use of said lands and waters, and in affording to them an opportunity to acquire the art of husbandry and other arts of civilization, and to become civilized, did reserve said lands from any and all forms of entry or sale and for the sole use of said Indians, and for their benefit and civilization. On, to wit, the 23d day of March, 1874, the said lands, having been previously surveyed, were by order of the then President of the United States, for the purposes aforesaid, withdrawn from sale or other disposition, and set apart for the Pah Ute and other Indians aforesaid.

. . . . .

"The United States by setting aside said lands for said purposes and creating said reservation, and by virtue of the matters and things in this paragraph set forth, did on, to wit, the 29th day of November, 1859, reserve from further appropriation, appropriate and set aside for its own use in, on, and about said Indian reservation, and the land thereof, from and of the waters of the said Truckee River, five hundred (500) cubic feet of water per second of time." Nevada App. 6a–8a.

This cannot be construed as anything less than a claim for the full "implied-reservation-of-water" rights that were due the Pyramid Lake Indian Reservation.

This conclusion is fortified by comparing the *Orr Ditch* complaint with the complaint filed in the proceedings below where, for example, the Government alleged:

"Members of the Pyramid Lake Paiute Tribe of Indians have lived on the shores of Pyramid Lake from time

immemorial. . . . They have relied upon water from the Truckee River for irrigation, for domestic uses, for maintenance of the lower segment of the Truckee River as a natural spawning ground for lake fish and for maintenance of the lake as a viable fishery.

.        .        .        .        .

"In establishing the Pyramid Lake Reservation in 1859, there was, by implication, reserved for the benefit of the Pyramid Lake Indians sufficient water from the Truckee River for the maintenance and preservation of Pyramid Lake, for the maintenance of the lower reaches of the Truckee River as a natural spawning ground for fish and the other needs of the inhabitants of the Reservation such as irrigation and domestic use." Nevada App. 153a–154a.

While the Government focuses more specifically on the Tribe's reliance on fishing in this later complaint, it seems quite clear to us that they are asserting the same reserved right for purposes of "fishing" and maintenance of "lands and waters" that was asserted in *Orr Ditch*.[13]

## B

Having decided that the cause of action asserted below is the same cause of action asserted in the *Orr Ditch* litigation,

---

[13] The District Court held that neither the United States nor the Tribe can "litigate several different types of water use claims, all arising under the *Winters* doctrine and all derived from the same water source in a piecemeal fashion. There was but one cause of action . . . based upon the *Winters* reserved right theory." Nevada App. 188a. The Court of Appeals observed, however, that the Government could have sought, even though it did not, an adjudication of a reserved right for certain purposes, such as irrigation, leaving open the possibility of expanding the Reservation's water rights for other purposes, such as the fishery. 649 F. 2d, at 1302. We need not resolve this dispute because we agree with the Court of Appeals that in *Orr Ditch* the Government made no effort to split its *Winters* cause of action.

we must next determine which of the parties before us are bound by the earlier decree. As stated earlier, the general rule is that a prior judgment will bar the "parties" to the earlier lawsuit, "and those in privity with them," from relitigating the cause of action. *Cromwell* v. *County of Sac*, 94 U. S., at 352.

There is no doubt but that the United States was a party to the *Orr Ditch* proceeding, acting as a representative for the Reservation's interests and the interests of the Newlands Project, and cannot relitigate the Reservation's "implied-reservation-of-water" rights with those who can use the *Orr Ditch* decree as a defense. See *United States* v. *Title Insurance & Trust Co.*, 265 U. S. 472, 482–486 (1924). We also hold that the Tribe, whose interests were represented in *Orr Ditch* by the United States, can be bound by the *Orr Ditch* decree.[14] This Court left little room for an argument to the contrary in *Heckman* v. *United States*, 224 U. S. 413 (1912), where it plainly said that "it could not, consistently with any principle, be tolerated that, after the United States on behalf of its wards had invoked the jurisdiction of its courts . . . these wards should themselves be permitted to relitigate the question." *Id.*, at 446. See also Restatement (Second) of Judgments § 41(1)(d) (1982). We reaffirm that principle now.[15]

---

[14] We, of course, do not pass judgment on the quality of representation that the Tribe received. In 1951 the Tribe sued the Government before the Indian Claims Commission for damages, basing its claim of liability on the Tribe's receipt of less water for the fishery than it was entitled to. *Northern Paiute Tribe* v. *United States*, 30 Ind. Cl. Comm'n 210 (1973). In a settlement the Tribe was given $8 million in return for its waiver of further liability on the part of the United States.

[15] This Court held in *Hansberry* v. *Lee*, 311 U. S. 32, 44 (1940), that persons vicariously represented in a class action could not be bound by a judgment in the case where the representative parties had interests that impermissibly conflicted with those of persons represented. See also Restatement (Second) of Judgments § 42(1)(d) (1982). The Tribe seeks to

We then turn to the issue of which defendants in the present litigation can use the *Orr Ditch* decree against the Government and the Tribe.   There is no dispute but that the *Orr Ditch* defendants were parties to the earlier decree and

take advantage of this ruling, arguing that the Government's primary interest in *Orr Ditch* was to obtain water rights for the Newlands Reclamation Project and that by definition any water rights given to the Tribe would conflict with that interest.   We reject this contention.

We have already said that the Government stands in a different position than a private fiduciary where Congress has decreed that the Government must represent more than one interest.   When the Government performs such duties it does not by that reason alone compromise its obligation to any of the interests involved.

The Justice Department's involvement in *Orr Ditch* began with a letter from the Secretary of the Interior to the Attorney General requesting that a single suit be brought by the Government for a determination "of all water rights in Lake Tahoe and Truckee River above the intake of the Truckee-Carson Reclamation project."   App. 263.   A Special Assistant United States Attorney assigned to the matter was apparently the first to recognize that the Government should in the same suit seek to establish the water rights to the Pyramid Lake Indian Reservation.   In a memorandum where the Special Assistant explained the reserved-water-rights holding of *Winters*, he advanced the view that "[t]hese Indian reservation water rights are important and should be established to the fullest extent because they are senior and superior to most if not all the other rights on the river." App. 269–270.

Contemporaneously with this report, the Acting Director of the Reclamation Service notified the Commissioner of Indian Affairs that an assertion of the Reservation's rights should be included in *Orr Ditch*.   The claim was advanced accordingly and thereafter the Bureau of Indian Affairs was kept aware of the *Orr Ditch* proceedings; during the settlement negotiations the BIA directly participated.   The BIA is the agency of the Federal Government "charged with fulfilling the trust obligations of the United States" to Indians, *Poafpybitty* v. *Skelly Oil Co.*, 390 U. S. 365, 374 (1968), and there is nothing in the record of this case to indicate that any official outside of the BIA attempted to influence the BIA's decisions in a manner inconsistent with these obligations.

The record suggests that the BIA alone may have made the decision not to press claims for a fishery water right, for reasons which hindsight may render questionable, but which did not involve other interests represented

that they and their successors can rely on the decree. The Court of Appeals so held, and we affirm.

The Court of Appeals reached a different conclusion concerning TCID and the Project farmers that it now represents. The Court of Appeals conceded that the Project's in-

---

by the Government. For instance, in a 1926 letter to a federal official on the Pyramid Lake Reservation, the Commissioner of Indian Affairs explained:

"We feel that the Indians would be wise to assume that Truckee River water will be used practically as far as it can be for irrigation, and that the thing for the Indians to do is, if possible, instead of trying to stop such development to direct it so that it will inure to their benefit.

.        .        .        .        .

". . . [I]f their ultimate welfare depends in part on their being able to hold their own in a civilized world . . . they should look forward to a different means of livelihood, in part at least, from their ancestral one, of fishing and hunting. They should expect not only to farm their allotments but also to do other sorts of work and have other ways of making a living." App. 435–436.

Furthermore, the District Court found that during the pendency of the *Orr Ditch* proceedings "a serious and reasonable doubt existed as to whether any *Winters* reserved water right could be claimed at all for an executive order Indian reservation." Nevada App. 185a.

In pressing for a different conclusion, the Tribe relies primarily on a finding by the District Court that it was the intention of the Government in *Orr Ditch* "to assert as large a water right as possible for the Indian reservation, and to do everything possible to protect the fish for the benefit of the Indians and the white population insofar as it was 'consistent with the larger interests involved in the propositions having to do with the reclamation of thousands of acres of arid and now useless land for the benefit of the country as a whole.'" Nevada App. 185a. The Tribe's focus on this ambiguous finding, however, has not blinded us to the District Court's specific finding on the alleged conflict.

"[T]here was a foreseeable conflict of purposes created by the Congress within the Interior Department and as between the Bureau of Reclamation on the one hand in asserting large water rights for its reclamation projects and the Bureau of Indian Affairs on the other in the performance of its obligations to protect the rights and interests of the Indians on the Pyramid

terests, like the Reservation's interests, were represented in *Orr Ditch* by the United States and thus that TCID, like the Tribe, stands with respect to that litigation in privity with the United States. The court further stated, however, that "[a]s a general matter, a judgment does not conclude parties who were not adversaries under the pleadings," and that in "representative litigation we should be especially careful not to infer adversity between interests represented by a single litigant." 649 F. 2d, at 1309. Since the pleadings in *Orr Ditch* did not specifically allege adversity between the claims asserted on behalf of the Newlands Project and those asserted on behalf of the Reservation, the Court of Appeals ruled that the decree did not conclude the dispute between them.

At the commencement of the *Orr Ditch* litigation, the United States sought water rights both for the Pyramid Lake Indian Reservation and for the irrigation of lands in the Newlands Project. It was obviously not "adverse" to itself in seeking these two separate allocations of water rights, and even if we were to treat the Paiute Tribe and the beneficial

---

Lake Paiute Indian Reservation. [T]his conflict of purposes was apparent prior to and during the *Orr Ditch* proceedings and was resolved within the executive department of government by top-level executive officers acting within the scope of their Congressionally-delegated duties and authority and were political and policy decisions of those officials charged with that responsibility, which decisions resulted in the extinguishment of the alleged fishery purposes water right. . . . The government lawyers in *Orr Ditch*, both departmental, agency and bureaus, as well as those charged with the responsibility for the actual conduct of the litigation, are not chargeable with an impermissible conflict of purpose or interest in carrying out the decisions and directions of their superiors in the executive department of government . . . ." *Id.*, at 189a–190a.

The District Court's finding reflects the nature of a democratic government that is charged with more than one responsibility; it does not describe conduct that would deprive the United States of the authority to conduct litigation on behalf of diverse interests.

owners of water rights within the Project as being in privity with the Government, it might be that in a different kind of litigation the res judicata consequences would be different. But as the Court of Appeals noted:

> "A strict adversity requirement does not necessarily fit the realities of water adjudications. All parties' water rights are interdependent. See *Frost* v. *Alturas*, 11 Idaho 294, 81 P. 996, 998 (1905); Kinney, *Irrigation and Water Rights* at 277. Stability in water rights therefore requires that all parties be bound in all combinations. Further, in many water adjudications there is no actual controversy between the parties; the proceedings may serve primarily an administrative purpose." 649 F. 2d, at 1309.

We agree with these observations of the Court of Appeals. That court felt, however, that these factors did not control these cases because the "Tribe and the Project were neither parties nor co-parties, however. They were non-parties who were represented simultaneously by the same government attorneys." *Ibid.* We disagree with the Court of Appeals as to the consequence of this fact.

It has been held that the successors in interest of parties who are not adversaries in a stream adjudication nevertheless are bound by a decree establishing priority of rights in the stream. See, *e. g.*, *Morgan* v. *Udy*, 58 Idaho 670, 79 P. 2d 295 (1938). In that case the Idaho court said:

> "'[I]n the settlement of cases of this character every user of water on the stream and all of its tributaries in litigation are interested in the final award to *each claimant* . . . . *Every claimant of the water* of either stream, it matters not whether it be at the upper or lower end of either, or after the junction of the two, *is interested in a final adjudication of all* the claimants of all the waters that flow to the claimants at the lower end of the stream

after its junction. In other words, . . . it matters but little who are plaintiffs and who are defendants in the settlement of cases of this character; the real issue being who is first in right to the use of the waters in dispute.'" *Id.*, at 681, 79 P. 2d, at 299.

This rule seems to be generally applied in stream adjudications in the Western States, where these actions play a critical role in determining the allocation of scarce water rights, and where each water rights claim by its "very nature raise[s] issues inter se as to all such parties for the determination of one claim necessarily affects the amount available for the other claims. *Marlett* v. *Prosser*, 1919, 66 Colo. 91, 179 P. 141, 142." *City of Pasadena* v. *City of Alhambra*, 180 P. 2d 699, 715 (Cal. App. 1947). See *Pacific Live Stock Co.* v. *Ellison Ranching Co.*, 52 Nev. 279, 296–297, 286 P. 120, 123 (1930); *In re Chewaucan River*, 89 Ore. 659, 666, 171 P. 402, 403–404 (1918). See also 6 Waters and Water Rights § 513.2, p. 304 (R. Clark ed. 1972 and Supp. 1978).

In these cases, as we have noted, the Government as a single entity brought the action seeking a determination both of the Tribe's reserved rights and of the water rights necessary for the irrigation of land within the Newlands Project. But it separately pleaded the interests of both the Project and the Reservation. During the settlement negotiations the interests of the Project, and presumably of the landowners to whom the water rights actually accrued, were represented by the newly formed TCID and the interests of the Reservation were represented by the Bureau of Indian Affairs. The settlement agreement was signed by the Government and by TCID. It would seem that at this stage of the litigation the interests of the Tribe and TCID were sufficiently adverse for the latter to oppose the Bureau's claim for additional water rights for the Reservation during the settlement negotiations.

The Court of Appeals held, however, that "in representative litigation we should be especially careful not to infer ad-

versity between interests represented by a single litigant," 649 F. 2d, at 1309, analogizing the Government's position to that of a trustee under the traditional law of trusts. But as we have indicated previously, we do not believe that this analogy from the world of private law may be bodily transposed to the present situation.

The Court of Appeals went on to conclude: "By representing the Tribe and the Project against the *Orr Ditch* defendants, the government compromised its duty of undivided loyalty to the Tribe. See Restatement (Second) of Trusts, *supra*, § 170, & Comments p, q, r." *Id.*, at 1310. This section of the Restatement (Second) of Trusts (1959) is entitled "Duty of Loyalty," and states that "(1) the trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary." Comments *p*, *q*, and *r* deal respectively with "[c]ompetition with the beneficiary," "[a]ction in the interest of a third person," and "[d]uty of trustee under separate trusts."

As we previously intimated, we think the Court of Appeals' reasoning here runs aground because the Government is simply not in the position of a private litigant or a private party under traditional rules of common law or statute. Our cases make this plain in numerous areas of the law. See *United States* v. *ICC*, 337 U. S. 426, 431–432 (1949); *Utah Power & Light Co.* v. *United States*, 243 U. S. 389, 409 (1917). In the latter case, the Court said:

> "As a general rule laches or neglect of duty on the part of officers of the Government is no defense to a suit by it to enforce a public right or protect a public interest. . . . A suit by the United States to enforce and maintain its policy respecting lands which it holds in trust for all the people stands upon a different plane in this and some other respects from the ordinary private suit to regain the title to real property or to remove a cloud from it." *Ibid.*

And in the very area of the law with which we deal in these cases, this Court said in *Heckman* v. *United States*, 224 U. S., at 444–445:

> "There can be no more complete representation than that on the part of the United States in acting on behalf of these dependents—whom Congress, with respect to the restricted lands, has not yet released from tutelage. Its efficacy does not depend on the Indian's acquiescence. It does not rest upon convention, nor is it circumscribed by rules which govern private relations. It is a representation which traces its source to the plenary control of Congress in legislating for the protection of the Indians under its care, and it recognizes no limitations that are inconsistent with the discharge of the national duty."

These cases, we believe, point the way to the correct resolution of the instant cases. The United States undoubtedly owes a strong fiduciary duty to its Indian wards. See *Seminole Nation* v. *United States*, 316 U. S., at 296–297; *Shoshone Tribe* v. *United States*, 299 U. S. 476, 497–498 (1937). It may be that where only a relationship between the Government and the tribe is involved, the law respecting obligations between a trustee and a beneficiary in private litigation will in many, if not all, respects adequately describe the duty of the United States. But where Congress has imposed upon the United States, in addition to its duty to represent Indian tribes, a duty to obtain water rights for reclamation projects, and has even authorized the inclusion of reservation lands within a project, the analogy of a faithless private fiduciary cannot be controlling for purposes of evaluating the authority of the United States to represent different interests.

At least by 1926, when TCID came into being, and very likely long before, when conveyances of the public domain to settlers within the Reclamation Project necessarily carried with them the beneficial right to appropriate water reserved to the Government for this purpose, third parties entered

into the picture. The legal relationships were no longer simply those between the United States and the Paiute Tribe, but also those between the United States, TCID, and the several thousand settlers within the Project who put the Project water to beneficial use. We find it unnecessary to decide whether there would be adversity of interests between the Tribe, on the one hand, and the settlers and TCID, on the other, if the issue were to be governed by private law respecting trusts. We hold that under the circumstances described above, the interests of the Tribe and the Project landowners were sufficiently adverse so that both are now bound by the final decree entered in the *Orr Ditch* suit.

We turn finally to those defendants below who appropriated water from the Truckee subsequent to the *Orr Ditch* decree. These defendants, we believe, give rise to a difficult question, but in the final analysis we agree with the Court of Appeals that they too can use the *Orr Ditch* decree against the plaintiffs below. While mutuality has been for the most part abandoned in cases involving collateral estoppel, see *Parklane Hosiery Co.* v. *Shore*, 439 U. S. 322 (1979); *Blonder-Tongue Laboratories, Inc.* v. *University of Illinois Foundation*, 402 U. S. 313 (1971), it has remained a part of the doctrine of res judicata. Nevertheless, exceptions to the res judicata mutuality requirement have been found necessary, see 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4464, pp. 586–588 (1981 and Supp. 1982), and we believe that such an exception is required in these cases.

*Orr Ditch* was an equitable action to quiet title, an *in personam* action. But as the Court of Appeals determined, it "was no garden variety quiet title action." 649 F. 2d, at 1308. As we have already explained, everyone involved in *Orr Ditch* contemplated a comprehensive adjudication of water rights intended to settle once and for all the question of how much of the Truckee River each of the litigants was entitled to. Thus, even though quiet title actions are *in*

*personam* actions, water adjudications are more in the nature of *in rem* proceedings. Nonparties such as the subsequent appropriators in these cases have relied just as much on the *Orr Ditch* decree in participating in the development of western Nevada as have the parties of that case. We agree with the Court of Appeals that under "these circumstances it would be manifestly unjust . . . not to permit subsequent appropriators" to hold the Reservation to the claims it made in *Orr Ditch;* "[a]ny other conclusion would make it impossible ever finally to quantify a reserved water right." 649 F. 2d, at 1309.[16]

---

[16] The Tribe makes the argument that even if res judicata would otherwise apply, it cannot be used in these cases because to do so would deny the Tribe procedural due process. The Tribe argues that in *Orr Ditch* they were given neither the notice required by *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306 (1950), nor the full and fair opportunity to be heard required by *Hansberry* v. *Lee*, 311 U. S. 32 (1940), and *Logan* v. *Zimmerman Brush Co.*, 455 U. S. 422 (1982). *Mullane*, which involved a final accounting between a trustee and beneficiaries, is of course inapposite. *Hansberry* was based upon an impermissible conflict in a class action between the representatives of the class and certain class members; we have already said that such a conflict did not exist in these cases and that in any event this litigation is governed by different rules than those that apply in private representative litigation. *Logan* did not involve a fiduciary relationship, and like *Mullane,* was a suit where the complaining party would be left without recourse. In these cases, the Tribe, through the Government as their representative, was given adequate notice and a full and fair opportunity to be heard. If in carrying out its role as representative, the Government violated its obligations to the Tribe, then the Tribe's remedy is against the Government, not against third parties. As we have noted earlier, the Tribe has already taken advantage of that remedy.

Finally, TCID challenges the Court of Appeals' conclusion that the Secretary of the Interior is not authorized to negotiate and execute an out-of-court settlement of disputed Indian water rights, and therefore that the *Orr Ditch* settlement agreement did not provide an independent bar to the Tribe's attempt to relitigate the *Orr Ditch* cause of action. Brief for Petitioner in No. 81–2276, pp. 42–48. Because of our disposition of the cases, we need not address this issue.

## IV

In conclusion we affirm the Court of Appeals' finding that the cause of action asserted below and the cause of action asserted in *Orr Ditch* are one and the same. We also affirm the Court of Appeals' finding that the *Orr Ditch* decree concluded the controversy on this cause of action between, on the one hand, the *Orr Ditch* defendants, their successors in interest, and subsequent appropriators of the Truckee River, and, on the other hand, the United States and the Tribe. We reverse the Court of Appeals, however, with respect to its finding concerning TCID, and the Project farmers it represents, and hold instead that the *Orr Ditch* decree also ended the dispute raised between these parties and the plaintiffs below.

*It is so ordered.*

JUSTICE BRENNAN, concurring.

The mere existence of a formal "conflict of interest" does not deprive the United States of authority to represent Indians in litigation, and therefore to bind them as well. If, however, the United States actually causes harm through a breach of its trust obligations the Indians should have a remedy against it. I join the Court's opinion on the understanding that it reaffirms that the Pyramid Lake Paiute Tribe has a remedy against the United States for the breach of duty that the United States has admitted. See *ante*, at 144, n. 16.

In the final analysis, our decision today is that thousands of small farmers in northwestern Nevada can rely on specific promises made to their forebears two and three generations ago, and solemnized in a judicial decree, despite strong claims on the part of the Pyramid Lake Paiutes. The availability of water determines the character of life and culture in this region. Here, as elsewhere in the West, it is insufficient to satisfy all claims. In the face of such fundamental natural limitations, the rule of law cannot avert large measures of loss, destruction, and profound disappointment, no matter

how scrupulously evenhanded are the law's doctrines and administration. Yet the law can and should fix responsibility for loss and destruction that should have been avoided, and it can and should require that those whose rights are appropriated for the benefit of others receive appropriate compensation.*

---

*I also note that the District Court found that one of the purposes for establishment of the Pyramid Lake Reservation was "to provide the Indians with access to Pyramid Lake . . . in order that they might obtain their sustenance, at least in part, from these historic fisheries." App. to Pet. for Cert. in No. 81–2245, p. 183a. As a consequence, the Tribe retains a *Winters* right, at least in theory, to water to maintain the fishery, a right which today's ruling does not question. To some extent it may be possible to satisfy the Tribe's claims consistent with the *Orr Ditch* decree—for instance, through judicious management of the Derby Dam and Lahontan Reservoir, improvement of the quality of the Newlands Project irrigation works, application of heretofore unappropriated floodwaters, or invocation of the decree's provisions for restricting diversions in excess of those allowed by the decree.