312 F.Supp.2d 1146 (2004)
Cyndi McCLENDON, Plaintiff,
v.
STORY COUNTY SHERIFF'S DEPARTMENT; Story County Sheriff Paul H. Fitzgerald; Story County Animal Control Department; Sue McCaskey; Brenda Rogers; Deputy Atkinson; Deputy Upchurch; Deputy Denny Watson; Deputy McKinney; and Deputy Thomas, Defendants.
No. 4:02-CV-40608.
United States District Court, S.D. Iowa, Central Division.
March 23, 2004.
*1147 *1148 Victoria L. Herring, Herring Law Office, Des Moines, IA, for Plaintiff.
Patrick J. McNulty, Clark I. Mitchell, Grefe & Sidney PLC, Des Moines, IA, for Defendants.

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT
GRITZNER, District Judge.
In this 42 U.S.C. § 1983 ("1983") action, Plaintiff Cyndi McClendon ("McClendon") alleges that Defendants Story County Sheriff's Department, Sheriff Paul Fitzgerald, Deputies Atkinson, Upchurch, Watson, McKinney and Thomas, Story County Animal Control Department, Sue McCaskey, and Brenda Rogers ("Defendants"), while acting under color of state law, wrongfully seized her horses in July 2001, in violation of her rights under the United States and Iowa Constitutions. McClendon seeks damages, statutory attorney's fees, as well as punitive damages.
Presently before the Court are motions by both parties for summary judgment (Clerk's Nos. 7 and 28). A hearing on the motions was held on January 21, 2004. Plaintiff was represented by Victoria Herring; Defendants were represented by Clark Mitchell and Patrick McNulty.

*1149 FACTS
Plaintiff Cyndi McClendon owns four acres of farmland in rural Maxwell where she keeps several animals. McClendon refers to herself as a "horse rescuer" who purchases horses at risk of slaughter. In caring for these horses, McClendon uses methods she considers to be consistent with natural horsemanship techniques.
During the Spring of 2001, Defendant Story County Animal Control Department ("SCACD") began receiving complaints about neglected horses on McClendon's property. On May 29, 2001, Defendant Sue McCaskey ("McCaskey"), Animal Control Director of the SCACD, received a call reporting horses in a county ditch in front of McClendon's house. McCaskey called McClendon and told her to recover her horses to avoid an accident. On May 31, 2001, McCaskey received another report of horses that looked neglected and starving. On June 6, 2001, SCACD received three reports that some of McClendon's horses were at large and not cared for properly. McCaskey and Defendant SCACD Assistant Animal Control Officer Brenda Rogers ("Rogers") went to McClendon's property and found horses out of their enclosures, in the ditch, and in the neighbor's field.
McCaskey and Rogers advised McClendon of the complaints and asked to inspect the grounds and the horses. With McClendon's consent, the officers conducted an inspection. They found thirty-seven horses divided among three enclosures which were each approximately one-half acre. Two enclosures had shelters; the third did not.
The inspection revealed enclosures filled with dangerous debris and inadequate water. One enclosure had only one empty twenty gallon water tank, while the other two enclosures shared a stock tank filled with sludge and brackish water. The officers observed horses exhibiting signs of malnutrition and did not see any grain stored on the premises.
McClendon told the officers she recently purchased several rescue ponies. She explained the excessive number of horses was temporary because she would be finding homes for some horses as soon as they were in better condition. She also explained there was a documented shortage of hay in the area and that she was supplementing the horses' diet with grain.
On June 8, 2001, McCaskey and Rogers returned and found no improvements to McClendon's property nor to the condition of the horses. The officers returned again on June 11, 2001, and found six horses at large. Through June 13, 2001, SCACD received several additional complaints about McClendon's animals. During this same period of time, Amy C. Suarez, Regional Director of the Humane Society of the United States, and Tom Colvin, Executive Director of the Animal Rescue League, began receiving complaints regarding the condition of the horses on McClendon's property.
On June 13, 2001, McCaskey and Rogers returned to McClendon's property accompanied by Nicole Snider ("Snider"), Livestock Inspector for the Iowa Department of Agriculture and Land Stewardship ("IDA"), and Lt. John Evans of the Story County Sheriff's Department. From her observations, McCaskey felt there had been no improvement in the conditions since her June 11, 2001, visit. Snider opined that animal husbandry standards were severely lacking, and basic daily nutritional needs were not being implemented.[1] The officers advised McClendon to *1150 provide the horses with sufficient grain and hay and to get rid of some of the horses.
On July 12, 2001, McCaskey and Rogers returned to the property accompanied by Dr. Kim D. Houlding, D.V.M. ("Dr.Houlding"). McClendon consented to an inspection of all the horses. After evaluating the horses, Dr. Houlding reasoned that six to eight were in imminent danger and ten to twelve needed supportive care to save them from strangles.[2] In a written report, Dr. Houlding made the following observations: (1) a rampant outbreak of strangles; (2) several horses emaciated to the point of starvation which would not survive much longer without treatment and care; and (3) pens filled with junk and hazards (protruding fence posts, sheet metal, wire, broken snow fence, and other objects such as discarded chairs) which created a great likelihood of injury to the horses. Dr. Houlding also expressed concern about the color and content of the water in the tanks.
McClendon told Dr. Houlding that the horses' appearance was not an indication of poor care. She explained that the horses had been abused and neglected before she rescued them and that is what caused their behavior and appearance. She also told Dr. Houlding that the horses were under the care of veterinarian Dr. Linda Thompson ("Dr.Thompson") of Iowa State University.[3] McClendon further contended that the greencolored water was safe; the algae was merely due to the hot weather.
Dr. Houlding concluded that all of McClendon's horses were inadequately cared for and inadequately fed, and that they were victims of improper disease control, ignorant feeding, and nutrition techniques and general mismanagement. Dr. Houlding opined that if some of the horses were not immediately removed and treated, they would most certainly die. Given the perceived mismanagement of the horses, Dr. Houlding suggested all animals should be removed until proper arrangements could be made for their care.
At 10:37 p.m. on Friday, July 13, 2001, a Story County Sheriff's deputy personally served McClendon with a written notice pursuant to Iowa Code § 717.2A (the "Notice"). The Notice indicated that McClendon's livestock may be rescued within one day's time unless a written response, signed by a licensed veterinarian, was delivered to the Story County Sheriff which stated that the animals were not neglected. According to the Notice, the animals subject to the rescue were as follows:
[A]ll horses currently exhibiting symptoms of the disease commonly called "strangles", a strep infection which has been observed in at least fourteen or more of the forty horses located at 67779 310th St., Maxwell, Iowa, and any horse(s) that are thin and weak exhibiting signs of malnutrition and or in danger of death.
On July 14, 2001, McClendon acknowledged the Notice by delivering a letter to the Story County Sheriff's office. Therein, McClendon stated, inter alia, it was a weekend and her veterinarian was unavailable, and therefore she could not comply *1151 with the Notice. McClendon requested to be given until Tuesday July 17, 2001, to respond. McClendon further indicated that she had spoken by telephone with veterinarian Dr. Joan Howard, who agreed with McClendon that moving the horses would further endanger them. Because this letter did not comply with the requirements of the Notice, the Story County Attorney proceeded with the application for a search warrant. Thereto, he attached the affidavits of McCaskey and Dr. Houlding.
Magistrate Lawrence E. Jahn ("Magistrate Jahn") read the application and attached affidavits and concluded there was a fair probability of a connection between the alleged crime of livestock neglect, the acreage of McClendon, and the animals to be seized. On July 14, 2001, Magistrate Jahn issued a search warrant stating in pertinent part:
Proof has been made before me, as provided by law, on this day that ... a number of horses that are sick and in immediate need of critical care. These horses are either exhibiting signs of a disease known as the "strangles", a strep infection contagious among horses or are weak and malnourished. That there is further sufficient proof of distressed and or endangered fowl and exotic birds at the acreage located in the out buildings and in the residence itself.
[The livestock] is being kept at ... 67779 310th St., Maxwell, Iowa in the possession of Cindy [sic] McClendon, and which is .... Property relevant to and material as evidence of a criminal prosecution.
You are commanded to make immediate search of ... the grounds of the acreage including any of the outbuildings and garage (which is counted as one of the six outbuildings) to locate and seize any horses found on the property in the above described condition. To search the grounds, out-buildings and house for any other of the named barnyard fowl and exotic birds located in the outbuildings, property or in the residence or garage to determine if there are other horses, fowl or exotic birds in distress or dying. To photograph any of the conditions found at the residence, grounds or outbuildings and to note/collect any evidence of lack of care and feeding of the noted livestock and other animals (exotic birds).
On July 15, 2001, Defendants went to McClendon's property to execute the search warrant. When they arrived, McClendon informed them that two horses had died[4] and several had been moved; only twenty-three horses remained. McClendon refused to tell the officials where the horses had been taken. She also argued that not all the horses belonged to her. McClendon admits that she moved the most infirm horses knowing they were targeted for removal. Dr. Houlding was present and advised the officers to seize the remaining twenty-three horses.
On August 12, 2001, pursuant to Iowa Code § 717, the SCACD filed a "Petition for Disposition of Neglected Livestock." Therein, the SCACD requested that the owner-ship of the horses be transferred from McClendon to the SCACD so that proper owners could be found.
On August 28, 2001, a four-day trial commenced before Judge Michael Moon on the petition for disposition ("Disposition Proceeding"). Judge Moon heard the testimony of Dr. Thompson who stated that she had been caring for McClendon's horses *1152 for about two years and found her care met normal standards. Dr. Thompson stated that when McClendon contacted her about an outbreak of strangles and asked whether to segregate the herd, she told McClendon it was pointless once an animal had been exposed. Dr. Thompson opined that an outbreak of strangles is not a sign of neglect; rather, it is caused by the highly contagious nature of the disease. She further testified that on August 27, 2001, approximately six weeks after the seizure, she was allowed to examine some of the horses that had been seized and gave them a body score in the four and five range.[5] She posited that based on her own review of the pictures and the video taken on July 12, 2001, only Zelda appeared to have been in great danger, and the other horses did not appear malnourished.
On October 2, 2001, Judge Moon entered an order dismissing the SCACD's petition. He stated that Dr. Thompson's testimony was entitled to great weight and that SCACD had not met its burden of showing the horses were neglected as defined by Iowa Code § 717.2.[6]

PROCEDURAL HISTORY
On December 4, 2002, McClendon filed this § 1983 action alleging the Defendants, while acting under color of state law, wrongfully seized her property in violation of her rights under the United States and Iowa Constitutions. On June 17, 2003, Defendants moved for summary judgment arguing McClendon's constitutional rights were not violated, and in the alternative, if a violation did occur, the Defendants were entitled to qualified immunity. The Defendants further argue McClendon's theory of liability against the Defendants in their official capacities is without merit.
On October 6, 2003, McClendon filed a cross motion for summary judgment, arguing Judge Moon's findings from the Disposition Proceeding are determinative on issues in this case, and the doctrine of collateral estoppel prevents Defendants from relitigating those issues. Defendants resist Plaintiff's motion, arguing summary judgment is not appropriate because McClendon has failed to establish the necessary requirements for application of collateral estoppel.
At the hearing held before this Court on January 13, 2004, Plaintiff conceded that the warrant was facially valid but maintains the Defendants exceeded the scope of the warrant by seizing all her horses, entering her home, and seizing other property not named in the warrant. McClendon asserts that when the horses were finally returned to her, they carried new illnesses and conditions which required veterinary treatment at her expense.

*1153 STANDARD FOR SUMMARY JUDGMENT
Federal Rule of Civil Procedure 56(c) states "the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of `the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).
"To preclude the entry of summary judgment, the nonmovant must make a sufficient showing on every essential element of its case on which it has the burden of proof at trial." Cont'l Grain Co. v. Frank Seitzinger Storage, 837 F.2d 836, 838 (8th Cir.1988). Rule 56(e) requires "the nonmoving party to go beyond the pleadings and by her own affidavits, or by the `depositions, answers to interrogatories, and admissions on file,' designate `specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)).
The court's function on a motion for summary judgment is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Niagara of Wis. Paper Corp. v. Paper Indus. Union-Mgmt. Pension Fund, 800 F.2d 742, 746 (8th Cir.1986). "`On summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.'" Matushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); Econ. Housing Co. v. Cont'l Forest Prods., Inc., 757 F.2d 200, 203 (8th Cir.1985). "[S]ummary judgment will not lie if the dispute about a material fact is `genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 257, 106 S.Ct. 2505. On the other hand, "[w]hen a motion for summary judgment is made and properly supported, the nonmoving party may not rely on bare allegations but must set forth specific facts showing that there is a genuine issue for trial." LeBus v. Northwestern Mut. Life Ins. Co., 55 F.3d 1374, 1376 (8th Cir.1995).

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT[7]
On October 6, 2003,[8] McClendon filed Plaintiff's Motion for Summary Judgment, *1154 arguing Judge Moon's order is dispositive on issues in the present § 1983 action, and the doctrine of nonmutual collateral estoppel prevents Defendants from relitigating those issues. Defendants resist Plaintiff's motion, arguing summary judgment in the Plaintiff's favor is not appropriate because McClendon has failed to establish the necessary requirements for application of collateral estoppel.

Discussion
Collateral estoppel, or issue preclusion can "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). For issue preclusion to apply, four prerequisites must be met: "(1) the issue sought to be precluded must be the same as that involved in the prior litigation; (2) that issue must have been actually litigated; (3) it must have been determined by a valid and final judgment; and (4) the determination must have been essential to the judgment." Lovell v. Mixon, 719 F.2d 1373, 1376 (8th Cir.1983) (citing In re Piper Aircraft Distrib. Sys. Antitrust Litig., 551 F.2d 213, 218-19 (8th Cir.1977)).
As originally applied, collateral estoppel was limited by the doctrine of mutuality; that is, "neither party could use a prior judgment as an estoppel against the other unless both parties were bound by the judgment." Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 329, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). "However, the mutuality requirement under federal law has been abandoned. Now, a party may rely on collateral estoppel even though he or she is not bound by the prior judgment if the party against whom it is used had a full and fair opportunity and incentive to litigate the issue in the prior action." Lane v. Peterson, 899 F.2d 737, 741 (8th Cir.1990) (citing Parklane, 439 U.S. at 322, 99 S.Ct. 645).
McClendon asserts that the prerequisites of nonmutual collateral estoppel have been met: (1) the Iowa District Court determined she was not liable for neglect; (2) a valid judgment was rendered on October 2, 2001, exonerating her; (3) the fact that Judge Moon found her not negligent is material and relevant because Judge Moon held that her rights were violated; and (4) the October 2, 2001, order is essential to show her rights were violated.
Contrary to McClendon's argument, the requirements for establishing nonmutual collateral estoppel have not been satisfied. First, the issue decided in the Disposition Proceeding was not the same issue before this Court. The issue before Judge Moon was whether McClendon's horses had been neglected and whether ownership should be transferred to the SCACD. In making that determination, Judge Moon found McClendon had not neglected her horses, and therefore the horses should be returned to her. That is a different issue than the issue before this Court, which is whether Defendants violated McClendon's constitutional rights in executing the search warrant. The proper execution of a search warrant is not dependent upon the ultimate resolution of the case. The issue before this Court rises or falls without regard to the ultimate determination of negligence on the part of McClendon.
Second, the issue of Defendants' liability for a constitutional violation was not raised or litigated in the prior action. Although Judge Moon intimated that the SCACD committed procedural errors regarding the Notice served upon McClendon, he never found the SCACD was guilty of anything; rather, he determined that by a preponderance of the evidence, McClendon was not guilty of neglect as defined by *1155 § 717.2A.[9] The allegation in the present action is that the Defendants violated McClendon's constitutional rights. That issue was neither litigated nor raised in the prior proceeding, and therefore collateral estoppel does not apply. Nevada v. United States, 463 U.S. 110, 130 n. 11, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983)(stating that collateral estoppel "can be used only to prevent `relitigation of issues actually litigated' in a prior lawsuit") (quoting Parklane, 439 U.S. at 326 n. 5, 99 S.Ct. 645).
Furthermore, in her "Response" brief, McClendon states that she is "seeking summary judgment on the issue that she was not neglecting her horses, as Judge Moon ruled, not on Defendants' personal liability." Therefore, McClendon effectively concedes her motion for summary judgment is not appropriate on the issue of Defendants' liability.[10]
For the foregoing reasons, the Court finds that the doctrine of nonmutual collateral estoppel does not apply. Accordingly, Plaintiff's Motion for Summary Judgment (Clerk's No. 42) must be denied.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Defendants move for summary judgment, arguing the Defendants did not violate McClendon's constitutional rights. In the alternative, they argue if a constitutional right was violated, they are entitled to qualified immunity. Defendants also argue that McClendon's theory of liability against the Defendants in their official capacities is without merit. McClendon resists the motion, arguing Defendants did violate her constitutional rights because they knew or should have known their *1156 conduct was unlawful; therefore, the qualified immunity defense is unavailable.[11]

Discussion

I. Qualified Immunity
"Qualified immunity is `an entitlement not to stand trial or face the other burdens of litigation.'" Saucier v. Katz, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "In a suit against an officer for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence." Id. The first inquiry is whether, taken in the light most favorable to the party alleging injury, the facts alleged show the officer violated a constitutional right. Id. at 201, 121 S.Ct. 2151. If no constitutional right would have been violated even if the alleged facts were proven, then the inquiry ends. Id.
On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable.
Id.

A. Violation of McClendon's Constitutional Rights
A seizure violates the Fourth Amendment if it is unreasonable, and a deprivation of property violates the Fourteenth Amendment if a person is not afforded the due process of law. Parratt v. Taylor, 451 U.S. 527, 537, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), overruled on other grounds by Daniels v. Williams, 474 U.S. 327, 330-31, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). "Nothing in that Amendment protects against all deprivations of life, liberty, or property by the State. The Fourteenth Amendment protects only against deprivations `without due process of law.'" Id. (quoting Baker v. McCollan, 443 U.S. 137, 145, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)).
McClendon argues that by seizing all of her horses and entering her house, the Defendants exceeded the scope of the search warrant and Notice and violated her constitutional rights. Defendants counter that neither act was beyond the scope of the warrant.[12]
*1157 McClendon's argument that entering her home exceeded the scope of the warrant fails. The search warrant clearly allowed the officers to do so. "You are commanded to make immediate search of: ... the grounds, outbuildings and house for any other of the named barnyard fowl and exotic birds ...." However, the scope of the warrant regarding how many horses the Defendants were permitted to seize is less clear.
The warrant commanded the officials to "seize any horses found on the property in the above described condition." That description was as follows: "a number of horses that are sick and in immediate need of critical care. These horses are either exhibiting signs of a disease known as the `strangles', a strep infection contagious among horses or are weak and malnourished."
Therefore, the scope of the search warrant only allowed for the seizure of those animals which were sick, in immediate need of critical care, exhibiting signs of strangles, or those that were weak and malnourished. The description in the warrant tracks the descriptions as set forth in the supporting affidavits.[13] Therefore, the execution of the warrant called for a subjective determination as to which animals fit the description. On July 15, 2001, the officials took all twenty-three horses found on the property.[14] The Defendants argue that seizing all the horses did not exceed the scope of the search warrant because Dr. Houlding was present at the seizure and advised them that all twenty-three horses should be rescued.
Although the search warrant did contain a subjective component which required a determination of which, if any or all, animals fit the description therein, the record contains conflicting evidence on the question of whether the professional opinion of the veterinarian was the basis for taking all of the horses, or if that remedy was a reaction to McClendon's removal of some horses from the premises.[15] Viewing the evidence in the light most favorable to the nonmovant, the Court cannot conclude as a matter of law that no constitutional violation occurred from actions a reasonable fact-finder could find patently beyond the *1158 scope of the warrant. Therefore, the Court must continue its inquiry as to whether the Defendants' conduct was objectively reasonable under the circumstances. Saucier, 533 U.S. at 199, 121 S.Ct. 2151 ("If, however, the law was clearly established when the conduct occurred, ... the second step is to determine if a reasonable officer could have believed, in light of the clearly established law, that his conduct was lawful.").

B. Objective Reasonableness of Officials' Conduct
Defendants argue it was not objectively unreasonable for the officers to believe that rescuing all twenty-three horses was lawful.[16] They assert that Dr. Houlding's presence and recommendation at the seizure supports a finding of reasonableness since it was upon the affidavits of Dr. Houlding and McCaskey that the search warrant was issued. Defendants argue that the Court should be wary of substituting its hindsight view for that of the officer at the time. Bills v. Aseltine, 52 F.3d 596, 603 (6th Cir.1995). Defendants further argue that if officers of reasonable competence could disagree on this issue, immunity should be recognized. Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) ("Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.").
McClendon argues that none of the officials are entitled to qualified immunity because they knew or should have known they exceeded the scope of the search warrant by seizing all the horses. McClendon postulates that the officials intentionally seized all the horses in retaliation for having removed some of them. McClendon argues that "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct," Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and that in the present case, animal control officers and deputies charged with effectuating animal rescues should know and adhere to its terms.
Although Harlow, cited by McClendon, is still good law, the Supreme Court recently clarified the qualified immunity analysis in Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Therein, the Court articulates that the reasonableness of the violation and the qualified immunity analysis are distinct. Id. at 205, 121 S.Ct. 2151.
The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, *1159 however, the officer is entitled to the immunity defense.
Id.
Accordingly, it is the court's role to first determine whether an official's mistaken belief about the legality of his conduct was reasonable under the circumstances, thereby entitling the official to qualified immunity. Id. at 201, 121 S.Ct. 2151. ("`[W]e repeatedly have stressed the importance of resolving the immunity questions at the earliest possible stage in litigation.'") (quoting Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)).
Therefore, in the present case, using the objective reasonableness standard, the Court must ask whether the facts available to the Story County officials at the time would warrant a person of "`reasonable caution in the belief'" to find that the horses seized fit the description in the search warrant. Illinois v. Rodriguez, 497 U.S. 177, 188, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (quoting Terry v. Ohio, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).
On July 15, 2001, the facts known to the officials involved in executing the search warrant at McClendon's property were the hazardous conditions and the appearance of the horses. Several of the Defendants observed these conditions on previous occasions. The officials also knew that McClendon had removed some animals in anticipation of the seizure. In addition, the Defendants knew that the licensed veterinarian who had examined the herd just days before was present during the execution of the warrant. The Court now considers each official's role in the execution of the search warrant to determine whether the qualified immunity defense is available.

1. Sheriff Paul Fitzgerald
The only evidence in the record regarding Sheriff Fitzgerald is his affidavit wherein he states he had no involvement in the application or the execution of the search warrant. McClendon does not dispute this fact.[17] Therefore, the claim against Fitzgerald in his individual capacity must be dismissed.

2. Deputy Thomas
Similarly, the only evidence in the record regarding Deputy Thomas is his affidavit. Therein, he states that on July 15, 2001, he learned a search warrant was being executed at the residence of McClendon and arrived at the property at 2:10. McClendon has not made specific allegations against Deputy Thomas nor has she presented any evidence that Thomas was involved in executing the search warrant. Therefore, the claim against Deputy Thomas in his individual capacity must be dismissed.

3. Deputy Watson
The only account of Deputy Watson's involvement in the seizure is contained in his affidavit. Therein, he states he was not on duty on July 15, 2001. He was contacted at his home and advised that a search warrant was being executed at McClendon's acreage. He was asked to remove two dead horses and take the carcasses to the Iowa State Veterinary Lab in Ames. When he arrived at McClendon's residence, he loaded the carcasses onto a trailer and transported them. He states he had no further involvement in the execution of the search warrant.
McClendon has neither alleged nor presented any evidence that Watson had any further involvement with the execution of the search warrant. Nor does McClendon *1160 argue that seizure of the horse carcasses was a violation of her constitutional rights. Therefore, the claim against Deputy Watson in his individual capacity must be dismissed.

4. Deputies Atkinson & Upchurch
In his affidavit, Deputy Atkinson states that on July 14, 2001, he was informed that McClendon failed to comply with the Notice from SCACD and that a search warrant would be executed at her residence on Sunday July 15, 2001. The search warrant he received was facially valid and provided for, inter alia, the rescue of horses. He states that he met Deputy Upchurch at the property at 12:12 p.m., and they made contact with McClendon. McClendon was given a copy of the search warrant, and it was read to her in its entirety.
At her request, the deputies entered the residence so that McClendon could get a phone book and a video camera and to wake her fifteen year old son. McClendon requested to speak with McCaskey and Rogers. McClendon informed them that two horses, Zelda and Dolly, had died. She stated that she had moved the dead horses to the barn and had covered Dolly's body. When Atkinson observed the carcasses, he saw that Zelda had open sores about the face and head. Dolly had been placed in a collapsed, concrete bunker with twine wrapped around the lower legs, and the carcass was covered with dirt and waste.
McClendon admitted to Atkinson that she moved twelve horses to another location, but she refused to disclose the location. Atkinson stated that at the direction of Dr. Houlding, twenty-three horses were rescued; the officials numbered, photographed, loaded, and removed the animals as directed by the SCACD.
The testimony of Deputy Upchurch is similar. He states that on July 15, 2001, he was advised that a search warrant was to be executed at McClendon's property. Upchurch witnessed Deputy Atkinson reading the search warrant to McClendon in its entirety and provided her with a copy. They entered her property upon her request. Upchurch also stated that McClendon advised the officers they would find two dead horses. He also states that Dr. Houlding and the SCACD directed that all remaining horses should be rescued.
Atkinson and Upchurch were clearly involved in seizing the horses on July 15, 2001. McClendon argues that they knew or should have known they must abide by the terms of the search warrant and that seizing all her horses exceeded the scope of the search warrant. However, McClendon provides no other evidence or argument regarding the specific conduct of these officials.
While Deputies Unchurch and Atkinson knew or should have known that they must abide by the terms of the search warrant, the terms of the search warrant in the present case called for a subjective determination of which horses exhibited signs of strangles, neglect, malnutrition, or imminent danger. A licensed veterinarian, Dr. Houlding, and animal control officers McCaskey and Rogers, were present at McClendon's property on July 15, 2001, and advised the deputies that all the horses were in danger.
Therefore, the facts known to the deputies at the time included the hazardous and unsanitary conditions of the property and horses combined with the advice of a licensed veterinarian. The Court finds it was objectively reasonable for Upchurch and Atkinson to believe all the horses should be seized. The duties of sheriff's deputies typically do not require knowledge of equine health; therefore, reliance on the expertise of a licensed veterinarian to determine which animals fit the description *1161 set forth in the search warrant was objectively reasonable. McClendon obscured the identification of which animals were subject to seizure by removing twelve of them in anticipation of the seizure. Since McClendon would not divulge which animals had been removed or their current location, the deputies' reliance on Dr. Houlding's determination was all the more reasonable.
For the foregoing reasons, the Court finds Deputies Atkinson and Upchurch are entitled to qualified immunity; therefore, summary judgment on the claims against them in their individual capacities must be granted.

5. Deputy McKinney
Deputy McKinney's affidavit is the only evidence in the record of his involvement in the seizure. Therein he states that on July 15, 2001, he was advised a search warrant was to be executed at McClendon's residence. He arrived at the property and accompanied McClendon throughout the duration of the seizure. McKinney states he had no other involvement with the execution of the search warrant.
McClendon has not alleged that being supervised during the execution of a valid search warrant was a violation of her constitutional rights. The Court finds Deputy McKinney's conduct did not violate McClendon's constitutional rights; therefore, the claim against McKinney in his individual capacity must be dismissed.[18]

6. Brenda Rogers and Sue McCaskey
In her affidavit, Rogers states that she is an animal control officer for the SCACD and has been employed there since 1996. She details the numerous complaints the SCACD began receiving in the Spring of 2001 about neglected horses owned by McClendon. On several occasions, she personally observed horses out of their enclosures, in the ditch, and in the neighbor's field. She states that she and McCaskey informed McClendon of the complaints. Rogers personally observed about thirty-seven horses divided amongst three half-acre enclosures with inadequate shelter and filled with dangerous debris and trash. She further observed that given the number of horses on the property, the water supply was inadequate and dirty. Rogers did not see equipment, such as tractors, loaders, stock trailers, or even a pick-up truck, necessary to care for the large number of horses.
Rogers details four occasions prior to the seizure when she had gone to McClendon's residence because of complaints and saw horses that appeared malnourished as evidenced by skeletal features and bloated stomachs. On those occasions, McClendon was informed that she needed to provide the horses with sufficient grain and hay.
Rogers was also present on July 12, 2001, when Dr. Houlding examined the herd, and concluded that six to eight horses were in imminent danger and that another ten to twelve were in need of treatment due to strangles. According to Rogers, Dr. Houlding advised that if some of the horses were not immediately removed and treated, they would most certainly die and that removal of many, if not all of the horses, would be necessary to prevent further neglect.
Rogers was present during the execution of the search warrant on July 15, 2001. She was aware that McClendon removed several horses prior to execution of the search warrant and that the remaining twenty-three horses were seized upon Dr. Houlding's advice.
*1162 McCaskey states that she has worked for SCACD since 1994 and has been animal control director since 1997. Her account of the events leading up to the July 15, 2001, seizure are consistent with Rogers' account. McCaskey was aware of additional complaints about McClendon received by the IDA and the Humane Society.
McCaskey's account of the visits to McClendon's property prior to the seizure are essentially the same as Rogers' account. In addition to those visits, McCaskey drove by the property with Story County Attorney Stephen Holmes on July 3, 2001. He recommended that McCaskey have a veterinarian observe the horses to verify the extent and severity of the apparent neglect; the July 12 visit was conducted for this purpose.
McCaskey states that she assisted with the search warrant application on July 14, 2001, and identified a herd of up to 40 horses, 200 to 300 barnyard fowl, and an unknown number of exotic birds on McClendon's property. She states that Holmes submitted the application, and a search warrant was issued by Magistrate Jahn.
McCaskey states that on July 15, 2001, she assisted in the seizure of twenty-three horses from McClendon's property. It was her understanding that such a rescue was authorized by Iowa Code § 717, as well as pursuant to a facially valid warrant. McCaskey states twenty-three horses were rescued pursuant to the advice of Dr. Houlding.
McCaskey further states that neither she nor Rogers has ever received discipline or criticism for their conduct as it related to this seizure, or for any conduct or activities related to the rescue of neglected animals.
The facts known to McCaskey and Rogers during the execution of the search warrant on July 15, 2001, differ in material respects from those known to the deputies previously discussed.
Both Rogers and McCaskey were aware that Dr. Houlding had identified between fourteen and twenty horses which were either in imminent danger or suffering from strangles. Even accounting for the subjective nature of the search warrant's description, a fact-finder might reasonably conclude Rogers and McCaskey knew or should have known that all twenty-three horses did not fit the description. Furthermore, both Rogers and McCaskey are animal control officers. Unlike the deputy sheriffs, Rogers and McCaskey worked with animals on a daily basis and routinely made determinations regarding the well-being of animals, including horses. In addition, during the Disposition Proceeding, McCaskey admitted that not all the horses seized were in imminent danger of death, compromised by strangles, or exhibited signs of malnutrition. She also testified that during the execution of the search warrant, she told McClendon the remaining horses were being seized because McClendon had removed some of the horses.[19]
*1163 For the foregoing reasons, viewing the facts in the light most favorable to the nonmovant, the Court finds that a material fact question remains regarding the conduct of Brenda Rogers and Sue McCaskey in executing the search warrant on July 15, 2001. Therefore, the Motion for Summary Judgment on the individual liability claims against Defendants Rogers and McCaskey must be denied.

II. Defendants' Liability in Their Official Capacities
Defendants argue that in her claims against the Story County Sheriff's Office, the Story County Animal Control Department, and all Defendants "in their official capacities", McClendon has failed to allege or show a policy or custom that caused the constitutional violation nor has she alleged or shown causation.
To maintain a constitutional violation claim against a municipality, a plaintiff must establish that it was a policy or custom of the municipality which caused the violation. Bd. Of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (reasoning that when the plaintiff seeks to hold a municipality liable for the acts of an employee tortfeasor, it is the plaintiff's burden "to identify a municipal `policy' or `custom' that caused the plaintiff's injury") (citing Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). In addition, claims against individuals in their official capacity can only be maintained if the claims are treated as suits against the municipality. Hafer v. Melo, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State.").
To maintain a liability claim against the Defendants in their official capacities, it is necessary for McClendon to show that these municipalities caused the damage and that their official policy evidenced indifference to her rights. Bryan, 520 U.S. at 407, 117 S.Ct. 1382 ("[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with `deliberate indifference' as to its known or obvious consequences.") (citing Canton v. Harris, 489 U.S. 378, 392, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). This stringent standard of fault requires that McClendon show that the "municipal actor[s] disregarded a known or obvious consequence of [their] action." Id. at 410, 117 S.Ct. 1382.
McClendon does not offer any legal argument in resistance to Defendants' motion. Rather, she merely states that all named Defendants, other than Fitzgerald, were directly involved in the seizure and *1164 removal of Plaintiff's horses, and therefore they all bear responsibility for the constitutional violations.
The Court finds that McClendon has not met her burden of establishing a policy or custom of the SCACD or the Story County Sheriff's Office to maintain a claim against these municipalities. Similarly, the liability claims asserted against Fitzgerald, McCaskey, Rogers, Atkinson, Upchurch, Watson, McKinney, and Thomas in their official capacities cannot be maintained. For the reasons set forth, the claims against all Defendants in their official capacities must be dismissed.

III. Claims Under the Iowa Constitution
In her Amended Complaint, McClendon alleges the Defendants violated her rights under the Iowa Constitution. Her request for relief includes damages, punitive damages, interest, costs, expenses, and statutory attorney's fees. Defendants argue pursuant to Iowa Code § 670.4(13) they are immune from liability against these claims.
Iowa Code § 670.4 states in pertinent part:
The liability imposed by section 670.2 shall have no application to any claim enumerated in this section. As to any such claim, a municipality shall be liable only to the extent liability may be imposed by the express statute dealing with such claims and, in the absence of such express statute, the municipality shall be immune from liability.
. . . . .
13. A claim based on an act or omission by a county or city pursuant to section 717.2A or chapter 717B relating to either of the following:
a. Rescuing neglected livestock or another animal by a law enforcement officer.
b. Maintaining or disposing of neglected livestock or another animal by a county or city.
Iowa Code § 670.4 (2001).
Regarding the personal liability of the officials, Iowa Code § 670.12 provides:
All officers and employees of municipalities are not personally liable for claims which are exempted under section 670.4 .... An officer or employee of a municipality is not liable for punitive damages as a result of acts in the performance of a duty, unless actual malice or willful, wanton and reckless misconduct is proven.
Iowa Code § 670.12 (2003).
McClendon argues that even if she cannot proceed for monetary relief on her Iowa constitutional claim, she could obtain an injunction barring further illegal actions by the Defendants in their enforcement of § 717.
The Iowa Constitution provides immunity for officers in the execution of provisions of § 717.2A. McClendon does not assert nor does the record support a showing that either Rogers or McCaskey acted with actual malice or willful, wanton and reckless misconduct, therefore McClendon's claim for punitive damages must fail. McClendon provides no legal support for her assertion that even if she is not entitled to monetary relief, she could obtain an injunction barring further enforcement of Iowa Code § 717.
For the reasons set forth, the Court finds the claims under the Iowa Constitution must be dismissed.

CONCLUSION
As set forth in the body of this Order, Plaintiff's Motion for Summary Judgment (Clerk's No. 28) is denied. Defendants' Motion for Summary Judgment (Clerk's No. 7) is granted in part and denied in *1165 part. Plaintiff's claims are dismissed except as to Defendants McCaskey and Rogers in their individual capacities.
IT IS SO ORDERED.
NOTES
[1] McClendon asserts that Snider berated her, would not listen to her explanations, and drew conclusions about the mental and physical condition of the horses based solely on her visual inspection. Snider is not a Defendant in this action.
[2] "An infectious disease of horses and related animals, caused by the bacterium Streptococcus equi and characterized by inflammation of the nasal mucous membrane and abscesses under the jaw and around the throat that cause a strangling or choking sensation." Dictionary.com, at http:// dictionary.reference.com/search?q=strangles.
[3] Following the July 12, 2002, visit, Dr. Houlding called Dr. Thompson asking about the care and treatment of McClendon's horses. Dr. Thompson indicated that she had not seen McClendon's herd since November 2000.
[4] One of the horses, Zelda, succumbed to "bastard" or internalized strangles. McClendon explained she was attempting to move the other horse, Dolly, because her foal was ill. Dolly died after she became entangled in her halter while awaiting transport.
[5] Body scoring is a system of appraising a horse based on the amount and proportion of the animal's fat. "[A] numerical designation of 1 (extremely emaciated) to 9 (extremely fat) is assigned to horses based on visual appraisal (what the horse looks like) and palpable fat cover (what the horse feels like) at six areas of the horse's body." J.M. Shuffitt & S.H. Tenbroeck, Body Condition Scoring of Horses, available at http:// www.animal.ufl.edu/Equine/Pub/BCS.pdf.
[6] Judge Moon made the following findings regarding Dr. Thompson's testimony:

She possesses knowledge of the most current research concerning the treatment of strangles and was personally involved in instructing McClendon about the treatment of a disease that was running through her herd. In Dr. Thompson's opinion, the horses were not malnourished and McClendon was doing everything in keeping with good animal husbandry practice with respect to the sustenance and care she was providing to her animals. She further testified that it is not a breach of good animal husbandry for an owner to have strangles in her herd.
[7] The argument raised in Plaintiff's motion for summary judgment is the same argument she raises in resistance to Defendants' motion; therefore, the Court will address Plaintiff's motion first.
[8] On August 21, 2003, McClendon filed a pleading captioned "Resistance to Motion for Summary Judgment and Plaintiff's Motion for Summary Judgment." Defendants filed a resistance, arguing Plaintiff failed to comply with procedural rules because she contemporaneously filed a resistance and a motion in the same pleading. McClendon filed a separate motion on October 6, 2003.
[9] Judge Moon's Order stated in pertinent part:

Procedurally there were two significant defects in the process followed by the Story County Animal Control Office in this case. Although the petitioner had Dr. Kim Houlding personally inspect the herd prior to the rescue, there was no testimony provided and no evidence introduced that satisfied the requirement that the petitioner receive a written statement concerning the fact that the horses were neglected.
. . . . .
The notice provided to McClendon ... that the horses to be rescued were those exhibiting symptoms of strangles and those that were thin and weak and exhibiting signs of malnutrition and/or in danger of death. It is uncontroverted that the petitioner took horses from McClendon that did not have strangles at the time they were taken, although they had been exposed to the disease.... It would therefore appear that the Story County Animal Control Office exceeded the express terms of its own notice by taking all of McClendon's horses on July 15, 2001. These procedural defects not-withstanding, the petitioner still has the burden of proving by a preponderance of the evidence that one or more of the horses owned by McClendon was neglected as defined by Iowa Code Section 717.2 in order to obtain the relief sought in this action.
. . . . .
The court has had the opportunity to observe the witnesses and to assess their credibility. The court has given great weight to the testimony of Dr. Tompson [sic] in this case.... In Dr. Thompson's opinion, the horses were not malnourished and McClendon was doing everything in keeping with good animal husbandry practice with respect to the sustenance and care she was providing to her animals. She further testified that it is not a breach of good animal husbandry for an owner to have strangles in her herd.
Petitioner has failed to meet its burden of showing by a preponderance or greater weight of the evidence that McClendon's horses were neglected.
[10] This concession suggests McClendon's motion is essentially an attempt to preclude the Defendants from presenting testimony, evidence, and arguments, such as the condition and appearance of her horses and property, simply because it was also used as proof of animal neglect in the Disposition Proceeding.
[11] On March 16, 2004, McClendon filed "Plaintiff's Provision of Supplemental Authorites." Therein, McClendon cites Groh v. Ramirez, 540 U.S. ___, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004), and merely states she believes it is relevant authority. The late submission of this authority is understandable as Groh was decided just three weeks ago, but that does not excuse the lack of legal analysis as to how Groh applies here.

The first sentence of Groh distinguishes it from the present case. "Petitioner conducted a search of respondents' home pursuant to a warrant that failed to describe the `persons or things to be seized.'" Id. at 1287 (emphasis added). The Supreme Court found that "[a]lthough the application particularly described the place to be searched and the contraband petitioner expected to find, the warrant itself was less specific; it failed to identify any of the items that petitioner intended to seize." Id. at 1288. Here, McClendon argues Defendants exceeded the scope of the search warrant and has conceded it was a facially valid search warrant. As such, Groh does not apply to the facts of this case.
[12] In her Complaint, McClendon alleges her rights were violated because Defendants did not follow proper procedure under Iowa Code § 717.2A (" § 717.2A"). Therein, she argues that Judge Moon found proper procedure had been violated, and therefore his findings are dispositive on the issue. As stated above, reference made to proper procedure in Judge Moon's Order were not findings, and therefore are not binding on this Court.

Furthermore, both in her resistance to Defendants' motion and at the hearing, McClendon conceded the facial validity of the search warrant and stated that her argument is that the officers exceeded the scope of the warrant. Therefore, the Court only addresses the alleged constitutional violations as they pertain to the scope of the search warrant.
[13] Dr. Houlding's written report of July 12, 2001, was submitted with the search warrant application. She stated that about eight horses were in imminent need of intervention and that the thinnest horses should be removed immediately or they may soon die. However, on July 15, 2001, the officials took all twenty-three horses found on the property.

Brenda McCaskey's affidavit was also submitted with the application. Therein, she opined that at least six to eight horses were in imminent danger.
[14] Defendants initially argued that under Iowa Code § 717.2A, a search warrant was not necessary. See Iowa Code § 717.2A(1)(a), (b) (2003) ("The officer may enter onto property of a person to rescue neglected livestock if the officer obtains a search warrant issued by a court, or enters onto the premises in a manner consistent with the laws of this state and the United States, ...").

Although § 717.2A may have authorized the seizure of neglected horses without a warrant, a warrantless search is not unlimited in scope. See United States v. Ross, 456 U.S. 798, 821, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (finding the scope of a warrantless search "is no broader and no narrower than a magistrate could legitimately authorize by warrant"). Furthermore, when operating without a warrant, "officers of course lose the protection that a warrant would provide to them in an action for damages brought by an individual claiming that the search was unconstitutional." Id. More importantly, at the hearing, Defendants conceded that because a warrant was issued, they were constrained to the scope set forth therein.
[15] See discussion infra part I.B.6.
[16] Although McClendon urges that Dr. Thompson's testimony at the Disposition Proceeding stating the horses did not appear to be diseased or malnourished is proof that the officials' conduct was unreasonable, the Court does not agree with this conclusion. Dr. Thompson's post hoc determination was made more than six weeks after the seizure for the purpose of determining whether McClendon was guilty of neglect, not whether the officers' conduct in seizing all the horses was objectively reasonable.
[17] McClendon did not raise a failure to supervise claim against Sheriff Fitzgerald.
[18] Even if the Court were to consider Deputy McKinney's supervision of McClendon during the execution of the search warrant as violative conduct, Deputy McKinney would be entitled to the same qualified immunity defense as Deputies Upchurch and Atkinson.
[19] The transcript shows the following exchange:

Q. All right. So there were a good number of these horses that were what we would call not in imminent danger of death and were not compromised by strangles or malnutrition; is that correct?
A. Several of the horses had the signs of strangles. They had the mucous in the nose. They weren't as bad as the ones with the abscesses, but they were exhibiting signs of strangles and I wouldn't call any of the horses in good condition.
Q. All right. But there were horses there that were, several not exhibiting signs of malnutrition; isn't that correct?
A. I'm not a vet. I would say they were all thin, but they were probably not all malnutrioned [sic] horses.
Q. All right. And there were also horses there that did not exhibit signs of strangles or any other disease; is that correct?
A. I didn't see all the nostrils or the abscesses. We were trying to do several things at the same time. Like I said, several of the horses we loaded had snotty noses and they had, you know, they were listless and with us not knowing what they were and for the protection of the horses because the others had been moved, we removed them.
Q. Now, at one point Cyndi McClendon spoke to you and specifically asked you that question that according to the news that you had served upon her that you were only going to take the horses that were suffering from malnutrition or that were showing signs of disease and then you had changed your mind to take all of the horses; is that correct?
A. That's correct.
Q. All right. And then at that time you told her that because of the fact that she had removed all or had removed part of the horses that you were then going to take all of the horses; is that correct?
A. Correct.